**UNITED STATES of America, Plaintiff,**

v.

**Gregorio JARAMILLO, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**Michael Eugene STURDEVANT, Defendant.**

**Nos. CR 74–L–8, CR 74–L–9.**

United States District Court, D. Nebraska.

Aug. 14, 1974.

Duane L. Nelson, Special Pros., for plaintiff.

Lewis Gurwitz, Cambridge, Mass., for defendants.

Clyde C. Henning, Rockville, Md., for defendant Jaramillo.

Robert C. Heeney, Rockville, Md., for defendant Sturdevant.

## MEMORANDUM OF DECISION ON THE MERITS

URBOM, Chief Judge.

The defendants have been indicted for attempting to enter on March 9, 1973, into Wounded Knee during an occupation of that village by American Indian Movement members or supporters.

Trial has been to the court without a jury. Transfer of the cases to the District of Nebraska was by consent of the parties in the interest of justice, pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure. The indictments are under 18 U.S.C. § 231(a)(3), which states:

> "Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects . . . the conduct or performance of any federally protected function . . . "

shall be punished. In order to find either defendant guilty it is necessary that the government establish beyond a reasonable doubt each and all the following essential elements:

1. That a civil disorder existed at the time of the arrest of the defendant on March 9, 1973;

2. That such civil disorder was resulting in interference with a federally protected function;

3. That one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and during the commission of such civil disorder;

4. That the defendant committed or attempted to commit any act for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, in a violent manner with such law enforcement officer or officers;

5. That such act or attempt to act was done wilfully and knowingly.

### I.

### CIVIL DISORDER

On the evening of February 27, 1973, a group of cars approached the trading post, which consisted of a store and mu-

seum, in the village of Wounded Knee on the Pine Ridge Reservation in South Dakota. Many persons emerged from the cars, shooting and yelling. There were over thirty cars involved and at least one hundred persons and probably more. They shot out the dawn-to-dusk lights that were in the vicinity of the trading post and proceeded to break into and loot the trading post, which was owned by the Sioux Corporation, carrying much of its contents to a nearby church in the village. Some persons who were residents of Wounded Knee were held hostage for three or four days. The fact that the trading post had been broken into and looted was communicated immediately to the Federal Bureau of Investigation, the United States Marshal Service, and the Bureau of Indian Affairs police by telephone by Agnes Gildersleeve, who witnessed the acts.

Later in the same evening members of the Federal Bureau of Investigation, the United States Marshal Service, and the Bureau of Indian Affairs police responded by establishing roadblocks at the major entry and exit roads to the village, because it was believed that the manpower then available was insufficient to permit trying to get into the village to make investigations or arrests. By the following morning armed occupants of Wounded Knee had established one or more roadblocks designed to prevent entry by federal law enforcement personnel, these roadblocks being nearer the village than the roadblocks set up by federal law enforcement personnel. From time to time throughout the period of February 28 through March 9 shooting occurred between persons inside Wounded Knee and the officers manning the federal roadblocks. Before March 9 reports also were received by law enforcement officers of the holding of hostages and the forcible entry of the post office in Wounded Knee.

The foregoing situation, except for the holding of hostages, continued until a time subsequent to March 9, the date of the alleged attempted entry of the defendants. Negotiations began between representatives of the Department of Justice and the occupiers of the village; cease-fire agreements were reached, but the presence of both sets of armed roadblocks and the presence of armed persons within Wounded Knee remained continuously from at least February 27 until at least March 9. During all the time from the beginning of the occupation on February 27 until after March 9 no members of the Federal Bureau of Investigation, the United States Marshal Service, or the Bureau of Indian Affairs police would have been permitted by the occupiers of Wounded Knee—except by forcible action—to enter the village for the purpose of investigating or making arrests in connection with the reported looting of the trading post, holding of hostages, or entry of the post office.

"Civil disorder" is defined by 18 U.S. C. § 232 as "any public disturbance involving acts of violence by assemblages of three or more persons which causes an immediate danger of or results in damage or injury to the property or person of any other individual."

■ Beyond a reasonable doubt there was a civil disorder existing on March 9, 1973, at the time of the alleged attempted entries by the defendants. The assemblage within Wounded Knee was of more than three persons; that assemblage involved acts of violence by many persons; the violence and assemblage resulted in damage to property of other individuals on February 27, 1973, and continued to cause thereafter through March 9 an immediate danger of damage or injury to the property or person of other individuals; and the assemblage remained from February 27 through March 9. There was, therefore, a civil disorder throughout the entire period.

II.

INTERERENCE WITH A FEDERALLY PROTECTED FUNCTION

■ The investigating of reported crimes and the operation of the post office were federally protected functions

and there was interference of both by the occupation of Wounded Knee, beyond a reasonable doubt.

## III.

## LAWFULNESS OF ENGAGING IN AND PERFORMANCE OF OFFICIAL DUTIES BY LAW ENFORCEMENT OFFICERS

Title 18 U.S.C. § 231(a)(3) presents the peculiar requirement that the prosecution prove beyond a reasonable doubt that a law enforcement officer or law enforcement officers were "lawfully" engaged in the "lawful" performance of official duties. The evidence on behalf of the government was that the United States marshals and members of the Federal Bureau of Investigation were present on the pivotal date of March 9 to enforce the laws—that is, to investigate and to make arrests for reported illegal acts within Wounded Knee and to contain the civil disorder. Although they may have been there also with respect to the reported entry of the post office, I think it is fair to say that the officers had little role on March 9 with respect to that matter. Similarly, the Bureau of Indian Affairs police, although useful in their assistance, had a relatively minor role in the manning of the roadblocks on March 9.

Prima facie lawfulness of the performance of their duties by the Federal Bureau of Investigation agents and the United States marshals is shown by the statutory provisions of the following: 18 U.S.C. § 3052:

"The . . . agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms . . . and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

18 U.S.C. § 3053:

"United States marshals and their deputies may carry firearms and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."

28 U.S.C. § 570:

"A United States marshal and his deputies, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof."

S.D.C. 7-12-1:

"The sheriff shall keep and preserve the peace within his county, for which purpose he is empowered to call to his aid such persons or power of his county as he may deem necessary. He must pursue and apprehend all felons . . . ."

The South Dakota statute quoted above, combined with 28 U.S.C. § 570, is an empowerment of marshals as to types of activities which may be undertaken. That is, marshals may "keep and preserve the peace" and "pursue and apprehend all felons." I am confident that the Federal Bureau of Investigation agents and the United States marshals ringing Wounded Knee on March 9 were in the performance of their duties of making arrests and preserving the peace. Implicit is the authority to contain the occupiers of Wounded Knee while negotiations ensued.

Much evidence was presented on the issue of whether the involvement of the military establishment was so substantial that it rendered the presence of the United States marshals and the Federal Bureau of Investigation agents unlawful, because the military activity was in violation of 18 U.S.C. § 1385, which states:

"Whoever, except in cases and under circumstances expressly authorized by

the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined   .    .    .    or imprisoned   .    .    ."

If there was "use" of "any part of the Army or the Air Force" to "execute the laws" and if that use pervaded the activities of the United States marshals and the Federal Bureau of Investigation agents, the marshals and the agents cannot be said to have been "lawfully engaged" in the "lawful performance" of their official duties.

■ Use of substantial amounts of materiel and equipment furnished by the Army is beyond dispute. A partial list of such items furnished before March 9 is as follows:

| | |
|---|---|
| 1,100 | Star parachute flares |
| 100,000 | rounds, M–16 ammunition |
| 100 | protective vests |
| 20 | sniper rifles |
| 15 | unarmed armored personnel carriers |

I am confident that the furnishing of this materiel, standing alone, is not a violation of 18 U.S.C. § 1385. The Economy Act, 31 U.S.C. § 686, expressly authorizes any executive department or independent establishment of the government, or any bureau or office thereof, to place orders with any other such department, establishment, bureau, or office, for materials, supplies, or equipment. Additionally, 18 U.S.C. § 1385 was intended, according to the legislative history found in 7 Cong.Rec. 3845–3852, 4240–4248, 4295–4304, and 4688, to eliminate the use of federal troops to execute the laws of the United States. The prevention of the use of military supplies and equipment was never mentioned in the debates, nor can it reasonably be read into the words of the Act. On the other hand, the use of troops to execute the laws was forbidden, unless expressly authorized by the Constitution or an Act of Congress. The debate reveals that the use of the term "any part of the Army or the Air Force" refers to any

unit of troops, whatever its size or designation. It is the use of military personnel, not materiel, which is proscribed by 18 U.S.C. § 1385. Congress has authorized the President of the United States to order use of the militia and armed forces, 10 U.S.C. § 331, ff, but no such order was made by the President. Accordingly, the critical question is the degree to which there was use of military personnel of the Army or Air Force at Wounded Knee to and including March 9.

Colonel Volney Warner, Chief of Staff of the 82nd Airborne Division of the United States Army, was ordered to the Pine Ridge Reservation on March 2, 1973, and arrived there in the early morning of March 3. Colonel Jack C. Potter, Deputy Chief of Staff of Logistics of the 6th United States Army, was directed also to the Pine Ridge Reservation and arrived on March 3. Colonel Warner's primary role was to observe conditions and developments at Wounded Knee for the purpose of advising the Department of Defense as to whether federal troops should be used at Wounded Knee. He constantly advised against the commitment of federal troops. He gave advice to Department of Defense officials regarding whether specific requests for military supplies and equipment by the Department of Justice should be approved, and no such requests were approved by the Department of Defense without Colonel Warner's approval. However, he did more than observe and advise the Department of Defense. He counseled Department of Justice officials on the scene to substitute a shoot-to-wound policy for a then-existing shoot-to-kill policy, and suggested the use of other Rules of Engagement which were a part of a military contingency plan for civil disorders. These Rules of Engagement, including the shoot-to-wound features, were adopted by Department of Justice personnel, including the Federal Bureau of Investigation and the United States marshals. He urged negotiations with the occupiers of the village. When a request was made by

law enforcement officers on the scene for armored personnel carriers to be stationed at each of the seven or eight roadblocks which surrounded Wounded Knee, Colonel Warner would recommend and did recommend approval of the request only upon the condition that assurance be given by the law enforcement officers that the armored personnel carriers would be used only defensively, that the perimeter of the roadblocks would not be tightened, that the armored personnel carriers would not be moved more than 100 meters in any direction, except after dark, and that no effort would be made to aggravate or encourage anybody to attack. These restrictions were acceded to by the Department of Justice officials, including the Director of the Federal Bureau of Investigation and the Director of the United States Marshal Service, and orders to the Federal Bureau of Investigation agents and United States marshals were made on the basis of such restrictions.

Colonel Warner also requested, almost immediately upon his arrival, that he be given help with logistics, and Colonel Potter came as a response to that request. Colonel Potter's primary role was to keep an inventory of the military supplies and equipment furnished for the Wounded Knee operation and to use his knowledge and expertise advising the Department of Defense of the availability and location of requested supplies and equipment.

Additionally, at least one aerial reconnaissance was made by the Nebraska National Guard, using National Guard personnel for the flight, at the request of the Federal Bureau of Investigation and the United States Marshal Service. Also, South Dakota National Guard mechanics were sent to the vicinity of the Reservation for repairing and maintaining the armored personnel carriers.

Instructions to the Federal Bureau of Investigation, the United States marshals, and the Bureau of Indian Affairs personnel who manned the roadblocks, patrolled the areas between the road-

blocks, and used the equipment and supplies furnished by the Army, were given only by the officials of the Department of Justice and Department of Interior, not by the officials of the Department of Defense, which included the Army and the Air Force.

Colonel Warner, Colonel Potter, the personnel who repaired and maintained the unarmed armored personnel carriers, and the personnel who flew the one or more reconnaissance missions, were "any part of the Army or the Air Force."

The foregoing, it seems to me, is the essence of the evidence on which determination must be made as to whether there was use by the Department of Justice, including the Federal Bureau of Investigation and the United States Marshal Service, of "any part of the Army or the Air Force" to "execute the laws."

Resolution of the question of the lawfulness of the performance of the law enforcement officers is a factual one. The fact finder must be guided by rules of law, but factual findings must fill the interstices of the legal rules, because the evidence is subject to more than one interpretation. Whether the actions were lawful depends, in law, upon whether 18 U.S.C. § 1385 was violated. It was violated, in law, if, in fact, the law enforcement officers used any part of the Army or the Air Force to execute the laws. Did the Department of Justice, including Federal Bureau of Investigation agents and the United States marshals, actually use the Army or Air Force to execute the laws, or was the presence of military personnel a mere presence which did not influence the Department of Justice personnel in their decisions? Were the restrictions on the use of the armored personnel carriers acceded to because of Colonel Warner's insistence or quite independent of it? Was there a shift from a shoot-to-kill policy to a shoot-to-wound policy, and, if so, was it because of Colonel Warner's recommendations? Were negotiations carried out or affected in some way by Colonel Warner's urgings? Was the aerial reconnaissance used by the law enforce-

ment officers? These are factual questions that turn upon the interpretations of the evidence.

Therefore, it is incumbent upon the court as fact finder to decide as a factual matter whether the performance of their duties by the law enforcement officers was lawful. More than that, the burden is upon the prosecution, before the defendants can be found guilty, to prove to the fact finder beyond a reasonable doubt that the performance was lawful.

■ Upon consideration of the evidence, I conclude that there is a reasonable doubt as to whether the law enforcement officers were "lawfully engaged in the lawful performance of their official duties." Beyond a reasonable doubt the aerial reconnaissance was of no usefulness to the law enforcement officers. I cannot say, however, beyond a reasonable doubt that Colonel Warner's advice to Department of Justice officials, including Special Agent in Charge Trimbach of the Federal Bureau of Investigation and Director Colburn of the United States Marshal Service, was not utilized by the recipients of the advice and that conduct of the operation before and during March 9 was not appreciably affected by his advice. Neither can I find beyond a reasonable doubt that military personnel who repaired and maintained the armored personnel carriers did not contribute materially to the operation being carried out by the law enforcement officers.

It follows that the defendants must be acquitted.

Lest anyone be misled, let it be emphasized that this court is not finding that the actions of the Federal Bureau of Investigation agents or the United States marshals were unlawful or that anyone violated 18 U.S.C. § 1385, the posse comitatus statute. The prosecution's burden was to prove in court that the actions of those officers were lawful. It failed to carry that burden. My holding means no more than that.

This court is not disagreeing with the wisdom of the procedures used by the law enforcement officers at Wounded Knee or criticizing the soundness of Colonel Warner's advice. It is not my place to do so. I accept the methods adopted and the advice received as unreservedly reasonable. The fact remains that Congress has authoritatively declared that no part of the Army or the Air Force shall be used to execute the laws, except as expressly authorized by Congress or the Constitution. It does not matter whether the use is to good effect or bad effect or whether the advice taken is good advice or bad advice. Congress already has provided that the President could use military personnel in quelling civil disorders, but the President did not do so with respect to Wounded Knee. Congress could have passed and may yet pass legislation to permit the use of a limited or unlimited number of Army or Air Force persons to assist law enforcement officers to execute their duties in a civil disorder without presidential order. But it has not done so. The people could have amended or could yet amend the Constitution to permit use of the military services under whatever circumstances they declare. But they have not done so. I am bound to follow the law as it is, not as it will or could become.

The policy underlying Congress' restricted posture on the use of military personnel was recently noted by Chief Justice Burger in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972):

"The concerns of the Executive and Legislative Branches in response to disclosure of the Army surveillance activities—and indeed the claims alleged in the complaint—reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs. That tradition has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without con-

**1382**

sent and in the constitutional provisions for civilian control of the military. Those prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime. . . ." 408 U.S. at p. 15, 92 S.Ct. at p. 2326.

Last Friday, August 9, the Honorable Fred J. Nichol announced the granting of a motion for judgment of acquittal at the end of the government's case in chief in a trial of United States v. Banks and United States v. Means, arising from the Wounded Knee occupation, with respect to identical charges as are presented here. He had almost exactly the same evidence before him that I have before me. While I respectfully disagree with his decision that the motion should be granted as a matter of law, rather than as a matter of fact, I freely acknowledge that his decision has been a factor in my consideration of the present case.

## IV.

## OTHER ISSUES

There is no need to discuss or decide whether either of the defendants committed or attempted to commit any act for the purpose of obstructing, impeding, or interfering in a violent manner with any law enforcement officer or officers, or whether such act or attempted act was done knowingly and wilfully. I have discussed in this memorandum the issues relating to civil disorders, because of the possible significance of those issues in other cases yet to be tried.

██ Perhaps two other issues are worthy of comment and decision because of their possible relevance to other trials arising out of the Wounded Knee operation. One is the question of whether the Special Operations Group of the United States Marshal Service is an army within the meaning of the Constitution of the United States and within the meaning of 18 U.S.C. § 1385. Upon consideration of the evidence I conclude

that the Special Operations Group is not such an army. The second is whether there has been such a selective prosecution that a motion to dismiss should be granted on that basis. In my opinion the evidence does not warrant a dismissal on that ground. The evidence before Judge Bogue and Judge Nichol, when Judge Bogue had the same motion before him in a group of cases consolidated for purposes of pretrial motions and when Judge Nichol had a similar motion before him in United States v. Banks (see reported decision at 368 F.Supp. 1245 (U.S.D.C.S.D.1973)), is before me now, as is some slight additional evidence. I agree with the analysis of Judge Nichol in that reported decision.