**UNITED STATES of America**

**v.**

**Geneva RED FEATHER et al.**

**No. CR73-5176.**

United States District Court,
D. South Dakota.

April 7, 1975.

Keith L. Uhl, Asst. U. S. Atty., Des Moines, Iowa, for plaintiff.

Wounded Knee Legal Defense/Offense Comm., Council Bluffs, Iowa, for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

The United States of America in its motion entitled Motion *In Limine* moves this Court to order counsel for the defendants to be restricted from making statements about, or introducing any evidence in any form, or in any other manner referring to (1) the loan and/or sale of military equipment to the Department of Justice used in its operations during the occupation in 1973 of Wounded Knee, South Dakota; (2) the presence of Department of Defense observers at Wounded Knee; and (3) any other involvement in 1973 of the Department of Defense at Wounded Knee, South Dakota.

Each of the defendants is charged by indictment with violating 18 U.S.C. § 231(a)(3) which provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

In order to meet its burden under 18 U.S.C. § 231(a)(3), the government must prove beyond a reasonable doubt each of the following elements:

1. That a civil disorder existed at the time the defendant was arrested;

2. That such civil disorder interfered with a federally protected function;

3. That one or more law enforcement officers were lawfully engaged in the lawful performance of their official duties incident to and dur-

ing the commission of such civil disorder;

4. That the defendant committed or attempted to commit any act for the intended purpose of obstructing, impeding, or interfering, either by himself or with someone else, in a violent manner, with such law enforcement officer or officers;

5. That such act or attempt to act was done willfully and knowingly.

The government's Motion *In Limine,* under consideration here, is concerned only with the third element listed above and presents the general question: What evidence is relevant and material to prove or disprove that "law enforcement officer(s)" were "lawfully engaged in the lawful performance of (their) official duties" under 18 U.S.C. § 231(a)(3).

Statutory authority clearly establishes the lawfulness of the activities of the United States marshals, agents of the Federal Bureau of Investigation, and other federal civil authorities present at the occupation of Wounded Knee in 1973. 18 U.S.C. § 3052 provides:

The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

18 U.S.C. § 3053 provides:

United States marshals and their deputies may carry firearms and may make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws

of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

28 U.S.C. § 570 provides:

A United States marshal and his deputies, in executing the laws of the United States within a State, may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof.

S.D.C.L. § 7–12–1 (1967) provides:

The sheriff shall keep and preserve the peace within his county, for which purpose he is empowered to call to his aid such persons or power of his county as he may deem necessary. He must pursue and apprehend all felons, and must execute all writs, warrants, and other process from any court or magistrate which shall be directed to him by legal authority.

S.D.C.L. § 7–12–1 (1967), combined with 28 U.S.C. § 570, grants to United States marshals equal standing and authority with South Dakota sheriffs to "keep and preserve the peace" and "pursue and apprehend all felons."

The four statutes cited above unquestionably provided the United States marshals and agents of the Federal Bureau of Investigation with full authority to be present and to undertake the law enforcement activities which occurred during the occupation at Wounded Knee. The government must, of course, adduce other evidence to prove the third element of the charge beyond a reasonable doubt, but the statutory authority does provide a permissive presumption that the law enforcement officers were "lawfully engaged" and that they "lawfully" performed their "official duties" of making arrests, preserving the peace, and containing the occupiers of Wounded Knee while negotiations ensued. By use of the term permissive presumption, this Court simply means that the jury will be permitted but will not be required to accept the existence of the presumed fact, even in the complete

absence of contrary evidence. Neither the burden of persuasion nor the burden of proof shifts to the defendants. Such a presumption in the absence of contrary evidence could be deemed sufficient to withstand a motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. This type of inference or permissive presumption simply leaves the jury free to accept or reject as it sees fit.

■ The defendants may choose to adduce evidence at trial to contradict the government's proof in an effort to prevent the government from proving this element beyond a reasonable doubt. Any evidence that the United States marshals or agents of the Federal Bureau of Investigation or other law enforcement officers violated the defendants' constitutional rights, for example, violation of the Fourth, Fifth or Sixth Amendments in the manner of arrest or search or in any other stage, is clearly relevant and material to this element of the offense. Although such proof may not be relevant or material to the first clause of the element, i. e. that "law enforcement officer(s)" were "lawfully engaged", such proof is relevant to the second clause of the element, i. e. that law enforcement officers were performing their official duties lawfully. It is fundamental that if the law enforcement officers performed official duties such as arrest and search in violation of the defendants' constitutional rights, the law enforcement officers would clearly not be performing their official duties lawfully. The evidence gathered in violation of the defendants' constitutional rights could be subjected to the exclusionary rule by this Court and such evidence would be unavailable to the government to prove its case beyond a reasonable doubt.

The government's Motion *In Limine* anticipates the defendants' plan to adduce evidence to show that the United States marshals and agents of the Federal Bureau of Investigation on duty at Wounded Knee during the 1973 occupation were not performing their official duties lawfully for the reason that their conduct is unlawful under 18 U.S.C. § 1385. This statute provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The government's claim that defendants plan to introduce evidence that the United States marshals and agents of the Federal Bureau of Investigation used the United States Army or Air Force, contrary to 18 U.S.C. § 1385, as a posse comitatus or otherwise to execute the laws, raises the following specific issue: whether evidence of military involvement during the occupation of Wounded Knee, irregardless of the degree or character of such involvement, is relevant and material and therefore admissible to show that federal law enforcement officers were not lawfully performing their official duties under 18 U.S.C. § 231(a)(3).

In the motion under consideration the government incorporated by reference the trial transcripts and documentary evidence of United States of America v. Jaramillo, 8 Cir., 510 F.2d 808; United States of America v. Sturdevant, 8 Cir., 510 F.2d 808; United States of America v. Means, Appellate Nos. 74–1676 and 74–1677; United States of America v. Banks, Appellate Nos. 74–1678 and 74–1679. The United States believes these transcripts fully identify the participation of the Department of Defense at Wounded Knee and establishes the testimony which would be obtained if testimony were taken in the instant cases regarding the role of the Department of Defense at Wounded Knee. The defendants agree that these transcripts contain much of the same evidence that would be offered in the remaining non-leadership Wounded Knee cases which contain an

18 U.S.C. § 231(a)(3) charge, but claims that additional evidence exists of military involvement which will be offered at trial.

The evidence of military involvement contained in the transcripts, in essence, falls into the following categories: use by federal civil law enforcement officers of materiel and equipment furnished by the United States Army and the South Dakota National Guard; the presence of United States Army personnel who were ordered to Wounded Knee to observe and report to the President through the Department of Defense the necessity of calling in federal troops; the drafting by military personnel of contingency plans to be used by the United States Army in the event that federal military intervention was ordered by the President; aerial photographic reconnaissance service provided by the United States Air Force and the Nebraska National Guard; the advice, urging and counsel given by United States Army personnel to Department of Justice personnel on the subjects of negotiations, logistics and rules of engagement; and the maintenance of military vehicles performed by members of the Nebraska National Guard. This categorizing of the evidence contained in the transcripts of the above-entitled cases is not to be construed as a finding of fact or as a limitation on what evidence could be offered by the defendants at a later time. This Court simply reviewed the transcripts for the limited purpose of deciding as a matter of law the issue presented here.

If the first word of 18 U.S.C. § 1385, "Whoever", is defined by proof to mean in this case one or more of the United States marshals or agents of the Federal Bureau of Investigation stationed at Wounded Knee during the 1973 occupation, then generally evidence of their willful use of "any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws", conduct made unlawful by Congress in 18 U.S.C. § 1385, is relevant and material to rebut government evidence on the third element of the 18 U.S.C. § 231(a)(3) charge that such law enforcement officers were lawfully performing their official duties. In stating this general rule this Court substantially agrees with Judge Nichol in United States v. Banks, 383 F.Supp. 368 (1974), and with Judge Urbom in United States v. Jaramillo, 380 F.Supp. 1375 (1974). Judge Nichol stated:

> However, since "lawful engagement" is an integral element of the offenses charged in Counts IV and V, and since posse comitatus relates to the issue of "lawful engagement", it is clear that the posse comitatus matter was, and is, inextricably intertwined in the question of the sufficiency of the evidence, and this Court has treated it as such. 383 F.Supp. at 376.

Judge Urbom stated:

> If there was "use" of "any part of the Army or Air Force" to "execute the laws" and if that use pervaded the activities of the United States marshals and the Federal Bureau of Investigation agents, the marshals and the agents cannot be said to have been "lawfully engaged" in the "lawful performance" of their official duties. 380 F.Supp. at 1379.

These general statements, although helpful, do not adequately answer the issue presented here. In order to specifically determine what 18 U.S.C. § 1385 evidence is or is not relevant and material to the third element of an 18 U.S.C. § 231(a)(3) charge, this Court must go further in its analysis of the unique relationship between the two statutes.

Upon careful examination of the legislative history of 18 U.S.C. § 1385, this Court has reached several conclusions of law. First, the clause contained in 18 U.S.C. § 1385 "uses any part of the Army or the Air Force as a posse comitatus or otherwise" means the direct active use of Army or Air Force personnel and does not mean the use of Army or Air Force equipment or materiel. 18 U.S.C. § 1385 was intended

by Congress, according to the legislative history found in 7 Cong.Rec. 3845–3852, 4240–4248, 4295–4304, and 4688, to eliminate the direct active use of federal troops by civil law enforcement officers. The prevention of the use of military supplies and equipment was never mentioned in the debates, nor can it reasonably be read into the words of the Act. Only the direct active use of troops was forbidden, unless expressly authorized by the Constitution or by Act of Congress. An Act of Congress, 10 U.S.C. § 331, has authorized the President of the United States to order use of the militia and armed forces, but no such order was issued by the President as to the Wounded Knee occupation. The Congressional debates clearly reveal that by use of the clause "any part of the Army or Air Force as a posse comitatus or otherwise" Congress intended to prohibit the direct active use of any unit of federal military troops of whatever size or designation to include one single soldier or large units such as a platoon or squadron, to execute the laws. The congressional debates also clearly reveal that Congress did not intend by 18 U.S.C. § 1385 to prohibit the use of Army or Air Force materiel or equipment of whatever kind to execute the laws. The language of this interpretation and the conclusion reached is borrowed almost verbatim from, and therefore agrees with, the interpretation and conclusion on the same point reached by Judge Urbom in United States v. Jaramillo, 380 F.Supp. 1375, 1379 (1974). The legislative history shows that when 18 U.S.C. § 1385 was enacted, many Southerners resented the use of federal troops in places in which government had been reestablished, especially since such use was often directed, in their view, toward altering the outcome of elections in Southern states. For example, in the disputed Tilden-Hayes election of 1876, Rutherford B. Hayes obtained the necessary electoral votes only because the disputed votes of South Carolina, Louisiana, and Florida were all awarded to him. In each of these states the elections were accomplished by the use of federal troops, ostensibly to preserve the peace, and in each state when elections were contested, the troops supported the reconstruction candidates. See, Chandler v. United States, 171 F.2d 921, 936 (1st Cir. 1948); 7 Cong.Rec. 4245 (1878) (remarks of Sen. Merriman); Id. at 3847 (remarks of Sen. Hale). Of primary concern was the prospect of United States marshals, on their own initiative, calling upon troops to form a posse or to otherwise perform direct law enforcement functions to execute the law. 7 Cong.Rec. 3579–86, 3846–49. Thus, Representative Knott, the House sponsor of the legislation, stated as explanation that the act was intended to stop army troops, whether one or many, from answering the call of any marshal or deputy marshal to perform direct law enforcement duties to aid in execution of the law. 7 Cong.Rec. 3849. See also, Id. at 4241. (remarks of Sen. Beck.) The appropriations restriction for fiscal year 1879 was therefore directed specifically to the "employment of any *troops* in violation of this section." (Emphasis added.) Other courts have interpreted the statute and have reached the same conclusion. In Chandler v. United States, 171 F.2d 921 (1st Cir. 1948), the Court stated:

. . . Originally a section inserted into an Army Appropriation Act as a backwash of the Reconstruction period following the Civil War. Its legislative history, as set forth in Lieber, The Use of the Army in Aid of the Civil Power, indicates that the immediate objective of the legislation was to put an end to the *use of federal troops to police* state elections in the ex-Confederate states where the civil power had been reestablished. *Id.* at 936. (Emphasis added.)

The Court in Gillars v. United States, 87 U.S.App.D.C. 16, 182 F.2d 962 (1950), stated:

As the Chandler case points out, the immediate purpose of the above provi-

sion was "to put an end to the *use of federal troops to police* state elections in the ex-Confederate states where the civil power had been reestablished." . . . By using the words "posse comitatus" the Congress intended to preclude the Army from assisting local law enforcement officers in carrying out their duties. *Id.* at 972. *See also,* Furman, Restrictions Upon the Use of the Military Imposed by the Posse Comitatus Act, 7 Mil.L.Rev. 85, 123 (1960). (Emphasis added.)

It is clear from the legislative history of 18 U.S.C. § 1385 and the above cases, the intent of Congress in enacting this statute and by using the clause "uses any part of the Army or the Air Force as a posse comitatus or otherwise", was to prevent the direct active use of federal troops, one soldier or many, to execute the laws. Congress did not intend to prevent the use of Army or Air Force materiel or equipment in aid of execution of the laws. Moreover, through enactment of the Economy Act of 1932, 31 U.S.C. § 686, Congress has provided extremely broad authorization for any executive department or independent establishment to place orders with any other willing department for materials, supplies, equipment, work, or service. As far back as 1915 Congress established procedures for the War and Navy Departments to procure or perform services for each other. 38 Stat. 1084 (1915). In 1920 these procedures were extended to any government department which procured by purchase or manufacture stores or materials, or performed services for any other department. 41 Stat. 613 (1920). A 1932 House Report of the 72d Congress set out the legislative intent of these Economy Acts:

> A free interchange of work . . . will enable all bureaus and activities of the Government to be utilized to their fullest and in many cases make it unnecessary for departments to set up duplicating and overlapping activities of their own . . . . The War and Navy Departments are especially well equipped to furnish materials, work, and services for other departments. Whenever such materials, work and services can be furnished at less cost your committee believes that private concerns should not be called upon to furnish, do, and perform what Government agencies can do for each other. H.R.Rep. No. 1126, 72d Cong., 1st Sess. (1932).

This Court agrees with the conclusion of Judge Urbom in United States v. Jaramillo, 380 F.Supp. 1375 (1974), wherein he stated:

> I am confident that the furnishing of this material, standing alone, is not a violation of 18 U.S.C. § 1385. The Economy Act, 31 U.S.C. § 686, expressly authorizes any executive department or independent establishment of the government, or any bureau or office thereof, to place orders with any other such department, establishment, bureau, or office, for materials, supplies, or equipment. 380 F.Supp. at 1379.

From the clear intent of Congress, this Court concludes that 18 U.S.C. § 1385 may be violated only through the direct active use of *troops* for the purpose of executing the laws and 18 U.S.C. § 1385 is not violated by the use of Army or Air Force materiels, supplies, or equipment of any type or kind in execution of the law. As applied to the instant motion, this conclusion of law means that evidence of the direct active use of Army or Air Force troops, one soldier or many, by the United States marshals or agents of the Federal Bureau of Investigation during the occupation of Wounded Knee, is unlawful conduct under 18 U.S.C. § 1385 and is relevant and material to disprove the third element of the charge against the defendants under 18 U.S.C. § 231(a)(3), that "law enforce-

ment officer(s)" were "in the lawful performance of (their) official duties." This conclusion of law also means, and this Court hereby holds, that any evidence of the use of Army or Air Force materiel, supplies, or equipment of any type or character by United States marshals or agents of the Federal Bureau of Investigation to execute the laws during the occupation of Wounded Knee is not unlawful conduct under 18 U.S.C. § 1385 and therefore is irrelevant, immaterial, and inadmissible in this case to disprove the third element of the 18 U.S.C. § 231(a)(3) charge against the defendants.

In passing, this Court notes that this holding is not only dictated by the statute and its legislative history, but from a practical economic standpoint, this holding is supported by common sense. During and after any natural disaster in this country whether due to flood, heavy snowstorms, earthquake, tornado or otherwise, there is always the possibility of looting and other acts of civil disorder. Most of this nation's smaller governmental units simply cannot maintain an inventory of emergency vehicles and other equipment adequate to meet such a crisis. If the affected municipality or county requests and receives, and law enforcement officers are using Department of Defense equipment or supplies to aid in enforcing the laws, and the elements of a civil disorder as defined by 18 U.S.C. § 232 are present and arrests are made, it would violate common sense and do violence to the intent of Congress in passing 18 U.S.C. § 1385 to hold that those arrested for criminal acts must be released because law enforcement officers were using military equipment to aid in executing the law.

 There remains in this Court's analysis of the unique relationship between 18 U.S.C. § 231(a)(3) and 18 U. S.C. § 1385 one additional clause to be construed. In order to more fully establish what evidence of military involvement would constitute unlawful conduct

under 18 U.S.C. § 1385 and thus be relevant to disprove the third element of the charge against the defendants under 18 U.S.C. § 231(a)(3), the clause "to execute the laws" contained in 18 U.S.C. § 1385 must be construed. It is the opinion of this Court that Congress intended, by use of the clause "to execute the laws", to make unlawful the direct active participation of federal military troops in law enforcement activities. Congress did not intend to make unlawful the involvement of federal troops in a passive role in civilian law enforcement activities. Other courts have made the same distinction in construing the clause "to execute the laws." In Burns v. State, 473 S.W.2d 19 (Tex.Crim.App. 1971), the Court held that assistance provided by military criminal investigators to law enforcement officers did not violate 18 U.S.C. § 1385. Sharp contrast is drawn by United States v. Walden, 490 F.2d 372 (4th Cir. 1974), wherein the Court held that the use of three enlisted marines as undercover agents actively investigating crime violated 18 U. S.C. § 1385. The distinction is also made by Wrynn v. U. S., 200 F.Supp. 457 (E.D.N.Y.1961), wherein the Court held that active direct participation by an Air Force helicopter and crew in a search of an escaped civilian prisoner violated 18 U.S.C. § 1385.

The legislative history referred to above reflects a sincere concern over the prospect of United States marshals, on their own initiative, calling upon troops to assist them in *actively* performing *direct* law enforcement duties. When President Hayes signed the posse comitatus statute into law he reflected this distinction:

The government is a good deal crippled in its means of *enforcing the laws* by the proviso attached to the Army Appropriation Bill which *prohibits the use of the Army as a posse comitatus to aid United States officers in the execution of process.* Entry for July 30, 1878, personal diary

of President Hayes. (Emphasis added)

The senators who drafted and debated the bill and President Hayes who signed the bill into law, were of the belief that 18 U.S.C. § 1385 made unlawful the use of federal military troops in the *active* role of *direct* law enforcement or execution of process.

Based upon the clear intent of Congress, this Court holds that the clause "to execute the laws", contained in 18 U.S.C. § 1385, makes unlawful the use of federal military troops in an active role of direct law enforcement by civil law enforcement officers. Activities which constitute an active role in direct law enforcement are: arrest; seizure of evidence; search of a person; search of a building; investigation of crime; interviewing witnesses; pursuit of an escaped civilian prisoner; search of an area for a suspect and other like activities. Such use of federal military troops to "execute the laws", or as the Court has defined the clause, in "an active role of direct law enforcement", is unlawful under 18 U.S.C. § 1385 and therefore is relevant and material to disprove the third element of 18 U.S.C. § 231(a)(3), *i. e.*, that law enforcement officers were lawfully performing their duties.

Activities which constitute a *passive* role which might *indirectly* aid law enforcement are: mere presence of military personnel under orders to report on the necessity for military intervention; preparation of contingency plans to be used if military intervention is ordered; advice or recommendations given to civilian law enforcement officers by military personnel on tactics or logistics; presence of military personnel to deliver military materiel, equipment or supplies, to train local law enforcement officials on the proper use and care of such material or equipment, and to maintain such materiel or equipment; aerial photographic reconnaissance flights and other like activities. Such passive involvement of federal military troops which might indirectly aid civilian law enforcement is not made unlawful under 18 U.S.C. § 1385 and therefore is not relevant or material and not admissible to disprove the third element of the 18 U.S.C. § 231(a)(3) charge against the defendants.

Based upon the above authorities and conclusions, it is ordered that the government's motion is hereby partially denied to the extent that any evidence that United States marshals or agents of the Federal Bureau of Investigation used Army or Air Force troops, one soldier or many, in an active role of direct law enforcement by performing one or more of the specific acts set forth above during the occupation of Wounded Knee, is admissible. Such evidence is unlawful under 18 U.S.C. § 1385 and therefore relevant and material to disprove the third element of the 18 U.S.C. § 231(a)(3) charge against the defendants, *i. e.*, that law enforcement officers were lawfully performing their official duties. It is further ordered that the government's motion is hereby partially granted for the reason that any evidence that United States marshals or agents of the Federal Bureau of Investigation used Army or Air Force equipment, supplies, or materiel, or Army or Air Force personnel who performed a passive role by performing one or more of the specific acts set forth above which might have indirectly aided law enforcement officers during the occupation of Wounded Knee, is not admissible. Such evidence is not unlawful under 18 U.S.C. § 1385 and therefore not relevant or material to disprove the third element of the 18 U.S.C. § 231(a)(3) charge against the defendants.