# Application of the Mansfield Amendment to the Use of United States Military Personnel and Equipment to Assist Foreign Governments in Drug Enforcement Activities

The Mansfield Amendment to the Foreign Assistance Act provides that "no officer or employee of the United States may engage in or participate in any direct police arrest action in any foreign country with respect to narcotics control efforts." 22 U.S.C. § 2291(c). Although the question of what constitutes a "direct police arrest action" within the meaning of the Amendment is not unambiguously answered by the language of the statute, the legislative history demonstrates that Congress was animated by concern that United States officers and employees not participate directly in joint drug raids with foreign authorities. The Amendment should therefore be understood to prohibit participation in narcotics control activity that would under normal circumstances be likely to lead to the arrest of foreign nationals. It does not prohibit involvement of United States officers in activities that would not ordinarily involve arrests.

September 18, 1986

MEMORANDUM FOR THE ATTORNEY GENERAL

This memorandum responds to your request for the views of this Office regarding the applicability of the Mansfield Amendment, 22 U.S.C. § 2291(c), to the use of United States military officers and equipment to assist foreign governments in their drug enforcement activities. You have also asked this Office to consider the possible statutory bases for using United States military personnel and equipment to assist in such operations.

The Mansfield Amendment provides that "no officer or employee of the United States may engage or participate in any direct police arrest action in any foreign country with respect to narcotics control efforts." The critical legal question raised by the Amendment is what constitutes a "direct police arrest action." The legislative history of the Amendment makes clear that Congress' central concern was that United States narcotics agents not participate in foreign drug raids and other law enforcement operations in which force was likely to be used. The standard employed by Congress for demarcating the scope of "direct police arrest action" under the Mansfield Amendment was whether the activity would, under normal circumstances, involve the arrest of individuals.

We believe the Amendment prohibits participation by United States officers in foreign anti-drug operations which typically involve arrests, such as drug

raids. Conversely, it does not in our judgment prohibit involvement of United States officers in activities that do not typically involve arrests, such as planning and preparing for a drug raid. Nor does it limit training of foreign agents, the provision of intelligence or equipment for drug operations, or participation in operations aimed solely at destroying drug crops or drug facilities where arrests are not expected.

The application of these general observations may raise difficult questions in the circumstances of any particular case.

The Mansfield Amendment to the Foreign Assistance Act provides as follows:

> (1) Notwithstanding any other provision of law, no officer or employee of the United States may engage or participate in any direct police arrest action in any foreign country with respect to narcotics control efforts. No such officer or employee may interrogate or be present during the interrogation of any United States person arrested in any foreign country with respect to narcotics control efforts without the written consent of such person. The provisions of this paragraph shall not apply to the activities of the United States Armed Forces in carrying out their responsibilities under applicable Status of Forces arrangements.

> (2) Paragraph (1) of this subsection shall not prohibit officers and employees of the United States from being present during direct police arrest actions with respect to narcotics control efforts in a foreign country to the extent that the Secretary of State and the government of that country agree to such an exemption. The Secretary of State shall report any such agreement to the Congress before the agreement takes effect.

22 U.S.C. § 2291(c). Before turning specifically to the questions you have raised about the applicability of the Mansfield Amendment, we address the congressional authorization for committing military personnel and equipment to assist in foreign anti-drug operations.

### I. Statutory Basis in the Foreign Assistance Act for Providing United States Military Personnel and Equipment to Assist in Foreign Anti-Drug Activities

The Foreign Assistance Act authorizes the President to furnish United States personnel and material resources to assist foreign governments in the enforcement of their drug laws. Section 2291(a) of Title 22 (§ 481 of the Foreign Assistance Act)[1] stresses the necessity of international cooperation "to control the illicit cultivation, production, and smuggling of, trafficking in, and abuse of narcotic and psychotropic drugs," and declares that "international narcotics

---

[1] This authority and the related appropriations authority are often referred to by the section designation in the Foreign Assistance Act.

control programs" should include elimination of narcotics-producing crops as well as "suppression of the illicit manufacture of and traffic in narcotic and psychotropic drugs." Accordingly, § 2291(a) expressly authorizes the President "to conclude agreements with other countries to facilitate control of the production, processing, transportation, and distribution of narcotics." More importantly, this section provides:

> Notwithstanding any other provision of law, the President is authorized to furnish assistance to any country or international organization, on such terms and conditions as he may determine, for the control of narcotic and psychotropic drugs and other controlled substances.

Although the language of this section does not expressly refer to military assistance, we believe that the section clearly authorizes the President to provide such assistance. Unlike other provisions of the Foreign Assistance Act, which explicitly distinguish among "economic," "military," and "nonmilitary," assistance,[2] the language of § 2291(a) of the Act is not qualified, broadly allowing for all types of assistance "[n]otwithstanding any other provision of law" and "on such terms and conditions as [the President] may determine."[3] Indeed, § 2291(i) of Title 22 defines the term "United States assistance" explicitly to include military assistance.[4]

Finally, the language of the Mansfield Amendment itself makes clear that Congress contemplated the provision of military assistance to foreign narcotics control efforts. The Mansfield Amendment's prohibition on participation in any "direct police arrest action" applies to any "officer or employee" of the United States, which is defined under the Foreign Assistance Act to include "civilian personnel and members of the Armed Forces of the United States Government." *Id.* § 2403(j). Moreover, the Mansfield Amendment expressly

---

[2] For example, 22 U.S.C. § 2382(b) instructs the Chief of the United States Diplomatic Mission in each country to make sure that the recommendations of other United States representatives "pertaining to military assistance (including civic action) and military education and training programs are coordinated with political and economic considerations." *See also id* § 2403(k).

[3] Prior to 1983, § 2291(a) of Title 22 allowed the President to "suspend . . . military assistance furnished *under this chapter* or any other Act" to any country if the President "determines that the government of such country has failed to take steps to prevent" drugs "produced or processed" in that country or "transported through such country" from entering the United States. (Emphasis added). Because the term "this chapter" includes a host of provisions authorizing foreign military assistance wholly unrelated to foreign anti-drug activities, the pre-1983 reference in § 2291(a) to "military assistance" cannot be read as a dispositive indication that Congress intended § 2291(a) to authorize the provision of American military assistance to foreign anti-drug efforts. Congress' reference in the pre-1983 version of § 2291(a) to "economic or military assistance," however, provides a strong indication that Congress knew how to distinguish among different types of assistance. It is thus difficult to escape the conclusion that Congress' unqualified use of the term "assistance" was intended to cover all forms of assistance, including military assistance. In 1983, § 2291(a) was amended to separate the provisions dealing with the President's power to suspend assistance to countries that do not take adequate steps to stem the illegal flow of narcotics to the United States. Pub L. No. 98-164, Title X, § 1003, 97 Stat. 1053 (1983); *see* 22 U.S.C. § 2291(h).

[4] Section 2291(i)(4) of Title 22 defines the term "United States assistance" to cover all forms of military assistance provided under the Foreign Assistance Act (with certain exceptions not relevant to this point, including an exception for "international narcotics control assistance").

124

excludes from its coverage "activities of the United States Armed Forces in carrying out their responsibilities under the applicable Status of Forces arrangements." 22 U.S.C. § 2291(c)(1). By implication, the use of United States armed forces personnel for activities other than Status of Forces arrangements[5] are thus covered by the Mansfield Amendment, and hence also within the positive authority granted to the President under § 2291(a).

Because the language of § 2291(a) contains no limitation on the type of assistance which the President can furnish to foreign governments to assist in their anti-drug activities, and because a broad reading of this authority is supported by the Mansfield Amendment and by other provisions of the Foreign Assistance Act, we conclude that the President has authority under the Act to furnish military assistance to foreign governments for such purposes.[7] The primary limitation on this authority is the Mansfield Amendment, to which we now turn.

---

[5] Status of Forces Agreements (SOFAs) are treaties that prescribe the conditions and terms that control the status of forces sent by one State into the territory of another State. In particular, SOFAs avoid jurisdictional clashes whenever the military personnel of one country, assigned to peacetime duty within another country, commit criminal acts. See, e.g., Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846. Thus, it makes sense that Congress would preclude such agreements from the scope of the Mansfield Amendment to allow the United States military to enforce United States (and perhaps foreign) drug laws, including arrests, against its own personnel serving a tour of duty in a foreign country.

[6] There may be difficult appropriations questions tied to the use of any particular authority. Assistance provided under § 2291(a) appears to be limited to funds authorized by Congress specifically for that foreign narcotics assistance program. Congress authorized appropriations of $57,529,000 for each of 1986 and 1987 "[t]o carry out the purposes of § 481." See Pub. L. No. 99–83, Title VI, § 602, 99 Stat. 228 (Aug. 8, 1985) (codified at 22 U.S.C § 2291a). Some limited funds from the Military Assistance Program (MAP) can be used to equip aircraft used for anti-drug operations under § 2291(a), but additional limitations in the form of notification of Congressional committees are attached to the use of these funds. Pub. L No. 99–83, 99 Stat. at 611 (codified at 22 U.S.C § 2311). Congress has placed other limitations on the use of the narcotics assistance funds provided under § 2291(a). Congress provided that appropriations made to carry out the purposes of § 2291(a) "shall not be made available for the procurement of weapons or ammunition." 22 U.S.C. § 2291b. The foreign narcotics assistance program developed under the authority of § 2291(a) is administered by the Secretary of State. Exec. Order. No. 12163, 44 Fed. Reg. 56678 (1979).

[7] Authority to use United States military resources to assist in foreign anti-drug activities may be found in other federal statutes as well. For example, 10 U.S.C. § 374(c) provides in part that "[i]n an emergency circumstance" United States military equipment, and personnel to operate and maintain it, "may be used outside the . . United States . . . as a base of operations by Federal law enforcement officials to facilitate the enforcement of [United States narcotics laws] and to transport such law enforcement officials in connection with such operations." This statute on its face contains a number of limitations on the provision of United States military assistance that do not apply to aid provided under § 2291(a). For example, under § 2291(a) United States military assistance may be provided in the absence of an "emergency circumstance" to facilitate the enforcement of foreign anti-drug laws, and it need not be to limited to use as a base of operations for federal law enforcement officials. In addition, United States military personnel furnished under 10 U.S.C. § 374(c) are prohibited from direct participation "in an interdiction of a vessel or aircraft, a search and seizure, arrest, or other similar activity unless participation in such activity by such [personnel] is otherwise authorized by law." Id. § 375.

Under 21 U.S.C. § 873(b), the Attorney General is authorized to call on other federal agencies to furnish assistance in carrying out his responsibility to enforce United States narcotics laws. This provision allows the Attorney General to request assistance if that assistance is within the otherwise authorized capacity of the assisting agency. This provision, accordingly, does not authorize the Attorney General to request, nor a responding agency to provide, assistance in the enforcement of foreign anti-drug laws. This Office has

Continued

125

## II. The Mansfield Amendment

The Mansfield Amendment forbids United States officers and employees from "engag[ing] or participat[ing] in any direct police arrest action in any foreign country with respect to narcotics control efforts." 22 U.S.C. § 2291(c)(1). This statute was amended in 1985 to make clear that United States officers and employees may be present during such direct police arrest actions, so long as the Secretary of State and the government of the foreign country agree to such presence. *Id.* § 2291(c)(2).[8] Determining the nature and scope of the Mansfield Amendment's limitation on United States assistance to foreign anti-drug activities thus hinges on the meaning of the term "direct police arrest action."[9]

The use of the term "arrest *action*," rather than simply "arrest," suggests that Congress intended to bar more than just participation in an actual arrest by foreign law enforcement officers. Congress' use of the modifier "direct," however, suggests that it intended to prohibit only conduct closely related, in time and place, to an actual arrest. The language of the Mansfield Amendment thus suggests that Congress intended to include within the Amendment's prohibition more than just the arrest of suspects, but did not intend to include conduct, such as the planning and preparation for the law enforcement operation, that is not closely related to arrests. The Amendment's peculiar linguistic formulation — "direct police arrest action" — does not on its face clearly identify the line between prohibited and permissible conduct.

---

[7] (. . . continued)
previously suggested that law enforcement operations conducted with assistance provided under § 873(b) must foreseeably lead to prosecutions under United States narcotics laws. *See* Memorandum to James I. Knapp, Deputy Assistant Attorney General, Criminal Division from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 18, 1984).

An additional positive source of authority to provide United States military resources to assist foreign governments in their anti-drug activities is § 22 U.S.C. § 2311 (§ 503 of the Foreign Assistance Act). That section authorizes the President "to furnish military assistance, on such terms and conditions as he may determine, to any friendly country . . . the assisting of which the President finds will strengthen the security of the United States and promote world peace . . . by . . . assigning or detailing members of the Armed Forces of the United States and other personnel of the Department of Defense to perform duties of a non-combatant nature." This provision is administered by the State Department, and it is our understanding that the State Department does not read § 2311 to authorize the provision of military assistance for purposes of foreign drug enforcement activities unless, perhaps, those activities are conducted by foreign military forces.

[8] This Office has been asked whether an "agreement to agree" to specific future operations satisfies the terms of the 1985 amendment to the Mansfield Amendment. This amendment allows United States officers to be *present* during arrest actions when the foreign government agrees, but it remains true that no officer may *engage or participate* in any direct police arrest action. The legislative history does not provide any explanation of the type of agreement required by the 1985 amendment. In the absence of further guidance, we assume from the language of the amendment that Congress meant to vest substantial discretion in the Secretary of State to develop such agreements. Thus it appears that oral agreements, for example, would satisfy the requirements of the amendment. Similarly, we assume that reports to Congress under the amendment may include notifying key committees that such agreements have been reached.

[9] The requirement that the direct arrest action relate to "narcotics control efforts" raises the question whether the Mansfield Amendment would apply to individual arrests since a single arrest might not be seen as part of a "narcotics control effort." It appears however, that an individual arrest, even though it might not necessarily relate to broader drug control efforts, is plainly within the Amendment's prohibition on participation in any "direct police arrest action." The Mansfield Amendment does not apply to arrest actions — or any other law enforcement action — not related to narcotics control efforts.

The legislative history of the Amendment provides useful insights. The Mansfield Amendment was proposed by Senator Mansfield after he had visited Southeast Asia in 1975 and had learned of the direct involvement of Drug Enforcement Administration (DEA) agents in Burmese and Thai anti-drug operations. Senator Mansfield was particularly critical of a "joint raid of an opium refinery" carried out by United States and Thai narcotics agents. *See* Report by Senator Mansfield, "Winds of Change: Evolving Relations and Interests in Southeast Asia," S. Rep. No. 382–38, 94th Cong., 1st Sess. 9 (Oct. 1975).[10] The origin of Senator Mansfield's particular concern in proposing the Mansfield Amendment — joint drug raids — suggests the framework for construing the meaning of "direct police arrest actions."

The Amendment as originally introduced provided that no United States officer or employee "may engage in any police action in any foreign country with respect to narcotics control efforts." 122 Cong. Rec. 2592 (1976). This language is both narrower and broader than the language eventually adopted. It is narrower in that it covers only officers who "engage" in certain actions, rather than those who "engage or participate." It is broader because it covers all "police actions" and not just "direct police arrest actions."[11]

In discussing the proposed Amendment on the Senate floor, Senator Mansfield emphasized his concern with "U.S. involvement in local drug raids." 122 Cong. Rec. 2592 (1976). He observed that United States agents "now participate in raids and other such activities alongside local police officials," and explained that his proposal would "put a limit on the extent to which U.S. personnel can participate" in such actions. *Id.*

Senator Percy, during debate on the initial version of the Amendment, noted that it "is designed solely to prevent American involvement where it is unnecessary to our own domestic drug law enforcement programs and where friction with foreign governments is likely to result." 122 Cong. Rec. 2591 (1976). In particular, according to Senator Percy, the Amendment "would prohibit United States narcotics agents operating abroad, whether by themselves or as members of teams involving the agents . . . of foreign governments, from engaging in actions where it is reasonably foreseeable that force will be used or an arrest of foreign nationals made." *Id.*

The legislative comments on the final version of the Amendment mirrored the concerns expressed by Senators Percy and Mansfield.[12] The Report by the House International Relations Committee on the final version noted that the provision was intended "to insure U.S. narcotics control efforts abroad are conducted in such a manner as to avoid involvement by U.S. personnel in

---

[10] Senator Mansfield considered local drug enforcement a "function of indigenous government." *See* Report by Senator Mansfield, "Winds of Change· Evolving Relations and Interests in Southeast Asia," S. Rep. No. 382–38, 94th Cong., 1st Sess. (1975).

[11] The Amendment as originally introduced was passed as part of the International Security Assistance and Arms Export Control Act of 1976, but this bill was vetoed by the President for reasons unrelated to the Mansfield Amendment.

[12] There is no indication in the legislative history that the shift in language between the initial and final versions of the Amendment reflected a change in the intentions of the measure's drafters and sponsors.

foreign police operations where violence or the use of force could reasonably be anticipated." H.R. Rep. No. 1144, 94th Cong., 2d Sess. 59 (1976).[13]

Joint drug raids provide the archetypical violation of Congress' desire that United States agents not participate in foreign law enforcement operations in which violence or the use of force is likely to occur.[14] Identifying participation in joint drug raids as the paradigm forbidden behavior, however, does not complete the necessary inquiry. It is still necessary to identify the point at which such raids, or "direct police arrest actions," begin and end. Here, too, the legislative history provides valuable assistance.[15]

The House International Relations Committee and the Senate Foreign Relations Committee both defined "arrest actions" to mean "any police action which, under normal circumstances, would involve the arrest of individuals whether or not arrests, in fact, are actually made." H.R. Rep. No. 1144, *supra*, at 55; S. Rep. No. 876, 94th Cong., 2d Sess. 61 (1976). *See also* 122 Cong. Rec. 2591 (1976) (remarks of Sen. Percy). This definition of "arrest action" makes clear Congress' intent to include more than the actual arrest of foreign nationals, but not to include activities which under normal circumstances would not involve such arrests. In the context of a drug raid, for example, the Mansfield Amendment would preclude the participation (though not presence)[16] of United States officers only in the raid itself, for only the actual raid would, under normal circumstances, involve arrests or the probable use of force. The Mansfield Amendment would not prohibit United States participation in any activity occurring before or after the raid, such as planning and preparing for the raid, or pre-positioning (including transportation) of foreign officers in the general vicinity of the raid target, because arrests do not normally occur during these

---

[13] Similar lines were drawn by the Senate Foreign Relations Committee on the initial version of the Amendment. *See* S. Rep. No. 605, 94th Cong., 2d Sess 55 (1976), *reprinted in part in* 122 Cong. Rec. 2592 (1976).

[14] Congress evidently believed that operations in which, under normal circumstances, arrests would be likely were also operations where violence or the use of force was likely.

[15] Similar boundaries on the participation of military personnel have been drawn for enforcement of domestic law under the Posse Comitatus Act. The Posse Comitatus Act, 18 U.S.C. § 1385, a Reconstruction era provision that was intended to prevent the participation of United States armed forces in the enforcement of domestic law, has been construed to permit civilian law enforcement agencies to use military equipment or receive training, and to permit military observers, but not to permit the use of military manpower in an active law enforcement role. In *United States* v. *Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1974), the court explained:

> Activities which constitute an active role in direct law enforcement are: arrest; seizure of evidence; search of a person, search of a building; investigation of a crime, interviewing witnesses; pursuit of an escaped civilian prisoner; search of an area for a suspect and other like activities. Activities which constitute a passive role which might indirectly aid law enforcement are: mere presence of military personnel under orders to report on the necessity for military intervention; preparation of contingency plans to be used if military intervention is ordered; advice or recommendations given to civilian law enforcement officers by military personnel on tactics or logistics; presence of military personnel to deliver military material, equipment or supplies, to train local law enforcement officials on the proper use and care of such material or equipment, and to maintain such material or equipment; aerial photographic reconnaissance flights and other like activities.

[16] As noted above, a 1985 amendment to the Mansfield Amendment specifically states that its prohibition should not be construed to forbid United States officers from being "present during direct police arrest action" in a foreign country if the Secretary of State and government of the foreign country reach an agreement to this effect. *See* Pub. L. No. 99-83, § 605, 99 Stat. 190, 229 (codified at 22 U.S.C. § 2291(c)(2)).

activities. Nor would supplying equipment, training, and intelligence for the raid violate the intent of Congress.[17] Similarly, participation of United States officers in foreign operations aimed at eradicating drug producing crops or drug processing facilities would not come within the Mansfield Amendment's prohibition if arrests are not likely to occur.

## Conclusion

In enacting the Mansfield Amendment, Congress was animated by concern that United States officers not participate directly in joint drug raids with foreign authorities. Congress addressed this concern by prohibiting United States officers from personally participating, except as observers, in any activity which, under normal circumstances, would be likely to lead to the arrest of foreign nationals.[18] The Amendment was not intended to prohibit participation of United States officers in activities occurring before or after any such "arrest action." The application of these principles to specific cases may raise difficult questions.

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17] Congress made clear that the role of the foreign government in requesting United States assistance does not alter the boundaries on the behavior of United States officers in drug raids. Senator Percy explained the Amendment's "basic meaning" as preventing involvement in actions in which force would result "whether or not the host government in question has requested the participation of American agents." 122 Cong. Rec. 2592 (1976). The Senate Foreign Relations Committee Report on the original version noted that it was intended to prohibit involvement in actions involving the arrest of foreign nationals "whether unilaterally (acting on their own) or as members of teams involving agents or officials of other foreign governments." *Id.*; *see also* S. Rep. No. 605, 94th Cong., 2d Sess. (1976).

[18] The Department has previously considered efforts to repeal or amend the Mansfield Amendment to remove its restriction on United States anti-drug activities abroad. The President's Commission on Organized Crime has recommended that the Mansfield Amendment "be repealed in its entirety." Presidential Commission on Organized Crime, *America's Habits, Drug Abuse, Drug Trafficking, and Organized Crime* 468 (March 1986).

129