PEOPLE v LIVINGSTON
PEOPLE v CARGILL
PEOPLE v STANLEY
PEOPLE v WADE

1. SEARCHES AND SEIZURES—CONVERSATIONS—WIRETAPPING—PARTICI-
PANT MONITORING—SEARCH WARRANT.

Participant monitoring, the use of an electronic device by a
participant of a conversation which transmits the exchange to
a third party, requires prior procurement of a search warrant.

2. CONSTITUTIONAL LAW—CRIMINAL LAW—NEW RULES—EFFECTIVE
DATE—RETROACTIVITY—PROSPECTIVE EFFECT.

Three factors have been used to determine when a new rule of
constitutional or criminal law is to take effect: the purpose of
the new rule, the general reliance on the old rule, and the
effect on the general administration of justice.

3. SEARCHES AND SEIZURES—CONSENT SEARCHES—WARRANT REQUIRE-
MENTS.

Consent searches have traditionally been exempt from the re-
quirement of a warrant.

4. SEARCHES AND SEIZURES—CONVERSATIONS—WIRETAPPING—WAR-
RANT REQUIREMENT—CASE PRECEDENT—PROBATIVE EFFECT.

Introduction of tape recordings into evidence is not proscribed
where the conversations were all recorded prior to a Supreme
Court decision requiring prior procurement of a search warrant
for the making of such recordings.

5. SEARCHES AND SEIZURES—EVIDENCE—SUPPRESSION—CONVERSATIONS
—PRIVATE WIRETAPPING—STATUTES—PENALTIES.

Evidence initially gathered by an individual in violation of the

REFERENCES FOR POINTS IN HEADNOTES
[1] 68 Am Jur 2d, Searches and Seizures § 36.
[2] No reference
[3, 8] 68 Am Jur 2d, Searches and Seizures § 46.
[4] 68 Am Jur 2d, Searches and Seizures § 24.
[5] 29 Am Jur 2d, Evidence §§ 425–427.
[6, 7] 29 Am Jur 2d, Evidence §§ 417, 436.

wiretapping act need not be suppressed; the Legislature provided for criminal sanctions against the interceptor and created civil liability for actual and punitive damages, but did not enact an exclusionary rule (MCLA 750.539c, 750.539h [b], [c]).

6. SEARCHES AND SEIZURES—EVIDENCE—PRIVATE WIRETAPPING—POLICE SURVEILLANCE—STATUTES—CONSTITUTIONAL LAW.

Tape recordings of telephone conversations made by a private individual at the request of a police officer do not violate statutory provisions of the wiretapping act unless otherwise prohibited by law; there being no statutory grounds for suppression of the recordings as evidence, the admissibility of the recordings must depend on the constitutionality of the search techniques (MCLA 750.539g[a]).

7. SEARCHES AND SEIZURES—CONSTITUTIONAL LAW—GOVERNMENTAL ACTION—PRIVATE WIRETAPPING.

Constitutional search and seizure provisions proscribe only governmental action; neither the Michigan nor the Federal Constitution requires suppression of a tape recording made by an individual solely in his capacity as a private citizen and not as an agent for the police.

8. SEARCHES AND SEIZURES—CONSTITUTIONAL LAW—WIRETAPPING—CONSENT—FOURTH AMENDMENT—SEARCH WARRANT—PROMISE OF IMMUNITY.

The Fourth Amendment requires no prior judicial authorization for governmental electronic recording of a private conversation where one of the parties to the conversation has consented to the surveillance; consent may be freely and voluntarily given even where it was extended under pressure of a potential indictment and in return for a promise of immunity (US Const, Am IV).

Appeal from Recorder's Court of Detroit, Samuel C. Gardner, J. Submitted June 17, 1975, at Detroit (Docket No. 21682.) Decided September 11, 1975.

Deotis Livingston, Alvin Cargill, Willie M. Stanley and Ossie B. Wade were charged with conspiring to commit first-degree murder. Motion to suppress evidentiary use of certain tape recordings granted. Plaintiff appeals by leave granted. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, and *John G. Burns,* Assistant Prosecuting Attorney, for the people.

*Henry, Smith, Sabbath & Dillard, P. C.,* for defendants Stanley and Cargill.

*John D. O'Connell,* for defendant Wade.

Before: T. M. BURNS, P. J., and QUINN and M. J. KELLY, JJ.

M. J. KELLY, J. On March 28, 1974, a combination of suspicious circumstances caused William Morgan to purchase a tape-recording device and attach it to the telephone line in his own home so that all incoming and outgoing calls would be recorded. He was interested in his wife's conversations. Upon listening to the first tape, he discovered that his wife had discussed with her close friend the possibility of having Mr. Morgan murdered. During the course of the conversation, mention was made of a prospective "hit man" from Chicago. Mr. Morgan took this tape to Detective Jack Morton at the Detroit police homicide division.

Detective Morton then approached Mrs. Morgan and suggested that she had been engaged in a criminal conspiracy to commit murder. He offered her immunity from prosecution if she would cooperate in the police attempt to identify the hired gunman. Mrs. Morgan agreed. However, through several weeks, follow-up was unproductive. The supposed conspiracy appeared unsupported in fact and the detective considered the case closed.

Toward the end of April, Mrs. Morgan received phone calls from a person who identified himself

as the man from Chicago. The caller sought reimbursement of expenses incurred in trips to Detroit claiming he had come to Detroit prepared to kill Mr. Morgan but had been unable to contact Mrs. Morgan. At any rate, the caller wanted money, Mrs. Morgan declined, and the caller threatened her. Then the Morgan home was firebombed.

After discussing the matter with her husband, Mrs. Morgan called Detective Morton. He suggested that Mrs. Morgan feign renewed interest in the murder plot so as to identify the hit man who, the officer surmised, was behind the firebombing. Thereafter, Mrs. Morgan made and received a number of phone calls which were recorded by her husband and Detective Morton with her knowledge. The outgrowth is that defendants stand charged with conspiring, MCLA 750.157a(a); MSA 28.354(1)(a), to commit the crime of first-degree murder, MCLA 750.316; MSA 28.548.

Defendants brought a motion to suppress the evidentiary use of the tape recordings. The motion was granted and the people appeal upon leave granted.

Two distinct sets of tapes are involved. There are the pre-firebombing tapes, which were made by Mr. Morgan without the knowledge of his wife or the police. There are also the post-firebombing tapes made with the purported consent of Mrs. Morgan and with the approval of the police. The two sets shall be discussed separately because, in our view, they necessitate different legal analysis. There are three essential theories for suppression by defendants.

They are:

I. That the tapes were obtained in violation of Const 1963, art 1, § 11, in that no search warrant was procured as required by *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975).

II. That the tapes were obtained in violation of the Michigan wiretapping act, MCLA 750.539a *et seq.;* MSA 28.807(1) *et seq.*

III. That the tapes were obtained in violation of US Const, Am IV and Const 1963, art 1, § 11, in that there was no voluntary consent by Mrs. Morgan to the warrantless search of her telephonic communications.

I

Defendants argue that the people were required to first obtain search warrants before they could lawfully tape conversations between Mrs. Morgan and the alleged co-conspirators. Reliance is placed on *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975), where the Supreme Court ruled that participant monitoring requires prior procurement of a search warrant. The *Beavers* opinion does not squarely control this case, because the *Beavers* Court specifically distinguished participant monitoring from recording by a participant. The *Beavers* Court noted:

"Where the phrase 'participant monitoring' appears, we specifically refer to the use of an electronic device *by a participant* of a conversation which transmits the exchange to a third party. We do not address those situations which include a participant himself *recording* the conversation or the use of an electronic device by a *third party only* to eavesdrop upon a conversation between two parties, one of whom is cooperating with the authorities." 393 Mich at 562, 563, fn 2. (Emphasis in original.)

This case, unlike *Beavers,* involves third-party recording and participant recording. As seen

above, the *Beavers* Court did not attempt to pass on the situation in the case at bar. The distinction is fine. We conclude that *Beavers' ratio decidendi* is equally applicable to the present fact situation. At present, a search warrant appears required before the conduct here described may be legitimized. The more critical question is whether the *Beavers* opinion is to be applied where, as here, the police conduct precedes *Beavers* and the trial follows.

The question arises because of the explicit holding: "The decision today is to be applied prospectively." 393 Mich at 568. The people's claim is that *Beavers* applies only to post-*Beavers* police conduct while defendants claim that the date of trial is dispositive. Three factors have been used to determine when a new rule of constitutional or criminal law is to take effect. The factors are: the purpose of the new rule, the general reliance on the old rule, and the effect on the administration of justice. *Linkletter v Walker,* 381 US 618; 85 S Ct 1731; 14 L Ed 2d 601 (1965), *People v Hampton,* 384 Mich 669; 187 NW2d 404 (1971).

Consent searches have traditionally been viewed as exempt from the warrant requirement. *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973), *Vale v Louisiana,* 399 US 30; 90 S Ct 1969; 26 L Ed 2d 409 (1970), *People v Chism,* 390 Mich 104; 211 NW2d 193 (1973). Police reliance on pre-*Beavers* law is reasonable. In fact, at the time of the recordings, this Court had affirmed the conviction of *Beavers.* We are not prepared to require that lay police not only appreciate the nuances of existing law but also successfully prognosticate change. We hold that the crucial date is that of the police conduct.

In *Desist v United States,* 394 US 244; 89 S Ct

1030; 22 L Ed 2d 248 (1969), the Court faced the question of how to apply the comparable case of *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967). The Court noted the nonretroactivity usually accorded search-and-seizure cases (394 US at 250; 89 S Ct at 1034; 22 L Ed 2d at 255) and concluded that *Katz* was to be applied to cases only where the police conduct occurred after the decisional date of *Katz.*

The case most favorable to defendant, *Johnson v New Jersey,* 384 US 719; 86 S Ct 1772; 16 L Ed 2d 882 (1966), applied *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR 3d 974 (1966), to cases awaiting trial as of the decisional date of *Miranda. Johnson* was severely restricted by *Michigan v Tucker,* 417 US 433; 94 S Ct 2357; 41 L Ed 2d 182 (1974), where the Court said:

"Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.

"We have recently said, in a search-and-seizure context, that the exclusionary rule's 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' *United States v Calandra,* 414 US 338, 347 [94 S Ct 613; 38 L Ed 2d 561] (1974). We then continued:

" ' "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way —by removing the incentive to disregard it." *Elkins v United States,* 364 US 206, 217 [80 S Ct 1437; 4 L Ed 2d 1669] (1960).' *Ibid.* In a proper case this rationale would

seem applicable to the Fifth Amendment context as well.

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least, negligent conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care towards the right of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." 417 US at 446.

We therefore conclude that *People v Beavers, supra,* is to be applied to police conduct occurring after its decisional date. In the instant case, the conversations were all recorded prior to *Beavers.* The introduction of those tapes at the trial of defendants is not proscribed.

II

Defendants also claim that the tapes are inadmissible because they were obtained in violation of the Michigan eavesdropping statute, MCLA 750.539a *et seq.;* MSA 28.807(1) *et seq.* The pertinent provisions read:

"Any person * * * who wilfully uses any device to eavesdrop upon the conversation without the consent of all parties thereto, or who knowingly aids, employs or procures another person to do the same in violation of this section, is guilty of a felony * * * ." MCLA 750.539c; MSA 28.807(3).

"Any person who installs in any private place, without the consent of the person or persons entitled to privacy there, any device for * * * eavesdropping upon the sounds or events in such place, or uses any such

unauthorized installation, is guilty of a felony * * * ." MCLA 750.539d; MSA 28.807(4).

"Any person who uses or divulges any information which he knows or reasonably should know was obtained in violation of sections 539b, 539c or 539d is guilty of a felony * * * ." MCLA 750.539e; MSA 28.807(5).

"This act shall not be construed to prohibit: (a) Eavesdropping or surveillance not otherwise prohibited by law by a peace officer or his agent of this state or federal government while in the performance of his duties." MCLA 750.593g(a); MSA 28.807(7)(a).

Of the initial tape recordings made by Mr. Morgan, two things are clear: neither party to the conversation consented to his intervention and there was absolutely no police involvement. It thus appears that Mr. Morgan's interception of the first calls was in violation of MCLA 750.539c; MSA 28.807(3). However, statutory violations do not call into play the per se exclusionary rule applicable to constitutionally defective searches and seizures. *People v Burdo,* 56 Mich App 48; 223 NW2d 358 (1974). The Court in *Burdo* recognized the issue as one of public policy and concluded that suppression was not necessary to protect the basic rights of the defendant. The Court also noted the potential civil liability for the statutory violation. See also *People v Mordell,* 55 Mich App 462; 223 NW2d 10 (1974).

The evidence initially gathered by Mr. Morgan in violation of the statute need not be suppressed. The Legislature provided for criminal sanctions against the interceptor and created civil liability for actual and punitive damages. MCLA 750.539h (b) and (c); MSA 28.807(8)(b) and (c). The Legislature did not enact an exclusionary rule. We will not judicially create a remedy that the Legislature chose not to create.

As to those conversations taped after Mr. Morgan went to the police, there is no statutory violation at all. From April 2, 1974 (the day Detective Morton confronted Mrs. Morgan) on, the tapes were made by the Morgans at the request of the detective. According to the explicit language of MCLA 750.539g (a); MSA 28.807(7)(a), the act does not prohibit the activity here in issue if the surveillance was "not otherwise prohibited by law", *i.e.,* if the techniques used were not constitutionally offensive. There being no independent statutory grounds for suppression, the admissibility of the tapes must rise or fall on the pre-*Beavers* constitutionality of the search.

The pre-firebombing tapes by Mr. Morgan were made by him solely in his capacity as a private citizen, and not as an agent for the police. It is well settled that constitutional search and seizure provisions proscribe only governmental actions. *Burdeau v McDowell,* 256 US 465; 41 S Ct 574; 65 L Ed 1048 (1921). *People v Harry James Smith,* 31 Mich App 366; 188 NW2d 16 (1971). Neither the state nor Federal constitution requires suppression of the recording of March 28, 1974. By ordering suppression of that tape the trial court was in error.

### III

This brings us to the heart of the matter. Twenty-seven of the twenty-eight tapes sought to be introduced into evidence by the prosecution were made after the firebombing incident. Since these recordings were made without the benefit of a search warrant, the consent of Mrs. Morgan, as a party to the conversations, was essential.

Mrs. Morgan testified at the suppression hearing that Detective Morton had asked her to pursue the

murder plot and indicated that she would not be charged with a crime. She said she was never worried about being charged with a crime because she felt that no crime had been committed.

Mrs. Morgan also testified that two days before the firebombing, she received a telephone call from a man who said he was from Chicago, that he had been to Detroit twice to do a job, and that he wanted his money; that if he did not receive the money "he would take me right along with Mrs. Wade" (one of the defendants). Two days later a firebomb was thrown through the kitchen window and landed behind her. One of the children received cuts on the face from the bomb.

Mrs. Morgan called Detective Morton and asked him to come to her house. She testified that Mr. Morgan was recording all phone calls, both incoming and outgoing, with her consent, and that she requested Detective Morton to help her record phone conversations. She also stated that she wanted Detective Morton to do this, and that no one forced her to do so.

After hearing Mrs. Morgan's testimony, as well as that of Mr. Morgan and Detective Morton, the trial judge ordered the tapes suppressed for lack of valid consent. He held that because the police promised Mrs. Morgan immunity from prosecution if she cooperated, and because her cooperation resulted in the arrest of a very close friend (Mrs. Wade had been her friend for seven years) her consent was the result of coercion. The judge relied principally on *Weiss v United States,* 308 US 321; 60 S Ct 269; 84 L Ed 298 (1939), in making this determination. In *Weiss,* the government intercepted a number of telephone messages in violation of § 605 of the Federal Communications Act of 1934. Those recordings could not be used to convict

Mr. Weiss unless, according to the act, they were "authorized by the sender". No pre-interception authorization had been obtained in *Weiss.* In an attempt to establish "authorization", the government informed certain co-conspirators of the tapes, discontinued the prosecution of one co-conspirator, paid salaries to other co-conspirators and generally treated the co-conspirators leniently. In exchange, the co-conspirators retroactively "authorized" interception. The Supreme Court held that the *nunc pro tunc* authorization was invalid.

In the instant case, it is the U. S. Constitution, not a Federal statute, which must be construed. More significantly, we deal with Mrs. Morgan's promise to permit recordation of *future* conversations. We do not deal with governmental activities illegal at their inception. In *United States v Dowdy,* 479 F2d 213 (CA 4, 1973), one Cohen, under threat of prosecution, agreed to permit government agents to listen in on conversations he held with defendant. Much as in the instant case, the co-conspirator became a government witness and deliberately sought to record a conversation which incriminated the defendant. He succeeded. We think that the disposition of the instant case is controlled by *United States v Dowdy, supra:*

"Defendant's first claim with respect to the recordings and the transcriptions is that his rights under the fourth amendment were violated. We think the complete answer to this contention is *United States v White,* 401 US 745; 91 S Ct 1122; 28 L Ed 2d 453 (1971) (plurality opinion), which held that the fourth amendment requires no prior judicial authorization for governmental electronic recording of a private conversation where one of the parties to the conversation has consented to the surveillance. Since Cohen consented to each recording, it follows that each recording and the transcriptions made from some did not violate defend-

ant's fourth amendment rights and were therefore admissible into evidence.

\* \* \*

"We reject defendant's argument that Cohen's consent was not freely and voluntarily given since it was extended under the pressure of a potential indictment and in return for a promise of immunity. Three circuits have rejected this argument, *United States v Silva,* 449 F2d 145, 146 (CA 1, 1971), *cert denied* 405 US 918; 92 S Ct 942; 30 L Ed 2d 787 (1972), *United States v Jones,* 433 F2d 1176 (D C Cir, 1970), *cert denied* 402 US 950; 91 S Ct 1613; 29 L Ed 2d 120 (1951), *Good v United States,* 378 F2d 934 (CA 9, 1967), and we agree." 479 F2d at 229.

The trial judge's ruling suppressing the evidence on the grounds that Mrs. Morgan's consent was not voluntary is clearly erroneous. The order granting defendants' motion to suppress is reversed and the cause remanded for trial.