PEOPLE v BURDEN

PEOPLE v JONES

Docket Nos. 78-4440, 78-4441. Submitted May 9, 1979, at Marquette.—
Decided December 6, 1979. Leave to appeal applied for.

Patrick C. Burden and Joyce Jones were each charged with two
counts of delivery of a controlled substance. Prior to trial, the
defendants moved to exclude the testimony of the prosecution's
main witness, Airman Michael Hall, a member of the United
States Air Force. The Marquette Circuit Court, John E. Mc-
Donald, J., determined that the use of Airman Hall in investi-
gating and obtaining evidence against the defendants was a
direct violation of the Federal Posse Comitatus Act, which
prohibits the use of military personnel as agents for the en-
forcement of civil law, and ordered that Airman Hall's testi-
mony be excluded. The prosecution appeals by leave granted.
*Held:*

The state police used Airman Hall, a member of the military,
to assist them in the execution of the law of the state, which
was a violation of the act. Since the act is a Federal act, the
Court of Appeals is bound by Federal policy when interpreting
it. The only real sanction for violation of the act is to exclude
evidence discovered by its violation. The trial court did not err
in holding that Airman Hall could not testify at the defen-
dant's trial.

Affirmed.

D. F. WALSH, P.J., dissented. He would hold that since Air-
man Hall was acting in an unofficial and individual capacity
and not as a member of the Air Force when he assisted the
Michigan State Police in their investigation of drug trafficking
in Marquette County there was no violation of the Posse

---

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 70 Am Jur 2d, Sheriffs, Police, and Constables § 30.

[2] 29 Am Jur 2d, Evidence § 415.

Modern status of rule governing admissibility of evidence obtained
by unlawful search and seizure. 50 ALR2d 531.

"Fruit of the poisonous tree" doctrine excluding evidence derived
from information gained in illegal search. 43 ALR3d 385.

Comitatus Act and that there was no basis for the exclusion of Airman Hall's testimony.

He would reverse the order excluding Airman Hall's testimony from the defendants' trial.

OPINION OF THE COURT

1. SHERIFFS AND CONSTABLES — POSSE COMITATUS ACT — CRIMINAL LAW — MILITARY PERSONNEL — STATUTES.

The Posse Comitatus Act prohibits the use of military personnel for enforcing local laws; the subjugation of civilians to military power would violate the act and so would the use of military personnel as undercover agents for civilian authorities; as long as the victim is subjected to civilian power or authority by the use of military personnel, the act is violated, and it matters not whether the victim even knows that the undercover agent is in the military (18 USC 1385).

2. EVIDENCE — POSSE COMITATUS ACT — CRIMINAL LAW — EXCLUSION — STATUTES.

Michigan courts have declined to adopt suppression of evidence as a remedy for unlawful police conduct involving situations involving violations of Michigan statutes; however, the Posse Comitatus Act is a Federal statute and Michigan courts are bound by Federal policy when interpreting it and since there are no cases involving the act in which violators of it were prosecuted, the only real sanction remaining to dissuade persons who would violate its provisions is the sanction of an exclusionary rule and the exclusion of any evidence obtained by a member of the military while acting as an agent for the civilian police (18 USC 1385).

DISSENT BY D. F. WALSH, P.J.

3. SHERIFFS AND CONSTABLES — POSSE COMITATUS ACT — CRIMINAL LAW — MILITARY PERSONNEL — STATUTES.

The Posse Comitatus Act's prohibition on the execution of laws by use of "any part of the Army or the Air Force" does not apply to military personnel performing in purely unofficial and individual capacities (18 USC 1385).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Gary L. Walker,* Prosecuting Attorney, and *Thomas L. Solka,* Assistant Prosecuting Attorney, for the people.

*Rush M. Shortley,* for defendants.

Before: D. F. WALSH, P.J., and BRONSON and T. M. BURNS, JJ.

T. M. BURNS, J. The facts of this case have been set forth adequately in the dissent of Judge WALSH. There is no question but that Airman Michael Hall, a member of the United States Air Force, agreed to assist the Michigan State Police in their investigation of drug trafficking in Marquette County. He agreed to do this after meeting with two members of the State Police in an office of an Air Force special agent. His participation in the drug investigation was approved by the Air Force base commander and, in return for his services, Airman Hall not only had criminal charges pending against him by the civilian authorities dropped, but was also told that his assistance would have a bearing on a decision of the Air Force whether to treat him as a "high risk" with regard to separate Federal drug charges. It was also understood that after completion of the investigation Airman Hall would be transferred to a new base where he would continue to assist the Air Force Office of Special Investigation.

The Posse Comitatus Act, 18 USC 1385, provides:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."

We agree with the conclusion of the lower court that the use of Airman Hall in the investigation of this crime was a direct violation of the act and

that his trial testimony therefore should be excluded.

The intent of Congress in promulgating this act was explained by a United States District Court of New York in *Wrynn v United States,* 200 F Supp 457, 464-465 (ED NY, 1961):

"The legislative history leaves little doubt that the statute is indeed meant 'to preclude the Army [or Air Force] from assisting local law enforcement officers in carrying out their duties' *(Gillars v United States,* 1950, 87 U.S. App. D.C. 16, 182 F. 2d 962, 972. Compare *Chandler v United States,* 1st Cir., 1949, 171 F.2d 921, 936). The view had been taken by Attorney General Caleb Cushing in 1854 that under Section 27 of the Judiciary Act of 1789, United States Marshals, like Sheriffs, could raise a posse comitatus comprising every person in the district above fifteen years of age 'whatever may be their occupation, whether civilian or not * * * including the military of all denominations, militia, soldiers, marines, all of whom are alike bound to obey the commands of a Sheriff or Marshall.' 1854, 6 Op.A.G. 466, 471, 473. As Cushing saw it, 'The fact that they are organized as military bodies, under the immediate command of their own officers, does not in any wise affect their legal character. They are still the posse comitatus.' 6 Op.A.G. 466, 473. Attorney General Charles Devens in 1878 took the same view of the law as it had been before the passage earlier in the same year, of Section 15 of the 1878 Act [the original version of the Posse Comitatus Act], and he stated that the practice had been to permit the military to be used in subordination to the marshals when such aid was needed to enforce process and he considered the practice to be sanctioned both by custom and by opinions of earlier Attorneys General (1878, 16 Op.A.G. 162, 163).

"When Section 15 was debated in the Senate the validity of Cushing's opinion was questioned by Senator Sargent & 7 Cong. Rec. 4247). Mr. Knott, who introduced the Section as an amendment to the Appropriation Bill, assumed only the existence and not the legitimacy of the practice (7 Cong. Rec. 3849) and argued the

importance of stopping such uses of the military, under adequate punitive sanctions except where the Congress had expressly authorized the use (7 Cong. Rec. 3846-3847). He envisaged the penalty he proposed as applying to everyone, from the Commander in Chief to the lowest officer, who presumed to take upon himself to decide when he would use the military force in violation of the law of the land (7 Cong. Rec. 3847, 3851) and visualized the statute as forbidding every employment of the Army or any part of it in aid of civil law enforcement unless under explicit statutory authorization (7 Cong. Rec. 3849). See, e.g., 10 U.S.C.A. § 331-334 (Presidential powers). The Senate amended the bill by adding the reference to express Constitutional authorization and by deleting so much of the House Bill's language as referred to use of the military 'under the pretext' of executing the laws (7 Cong. Rec. 4240). The senate debate indicated a sense that the section was not limited by the expression 'as a posse comitatus or otherwise' but was to operate as if the prohibition ran—simpliciter—against the use of the Army to execute the laws, without reference to whether employed as a posse comitatus or as a portion of the Army (7 Cong. Rec. 4241, 4245)."

As is evident, the Posse Comitatus Act was designed to prohibit the use of military personnel as agents for the enforcement of civil law.

The plaintiff in *Wrynn* was injured when an Air Force helicopter attempting to land struck a small tree and sent splinters of wood into the plaintiff's left leg. At the time of the accident, the helicopter was assisting local law enforcement officials in their effort to apprehend two prisoners who had escaped from the county penal farm. Plaintiff brought an action in negligence but a judgment of no cause of action was entered for several reasons, one of which was that plaintiff was precluded from recovering against the United States by the provisions of the Posse Comitatus Act which made use

of the helicopter unauthorized at the time of the accident:

"Given the statute and its continuing vitality, the use of the helicopter and its personnel here to aid in executing the laws of New York was a forbidden use. It could not have been authorized on behalf of the United States by any action short of a Congressional enactment. There could be no Air Force undertaking or enterprise in the premises to which its personnel or equipment could be lawfully assigned and, in consequence, the absence of any defect in formal orders, the absence of any element of self interest on the part of the officers and the presence of an obvious public safety objective are irrelevant. They cannot bring the case within the narrow area in which agents of the government can be found to be acting within the scope of their employment although beyond their actual authority * * * because there was here no activity that could be authorized, no legally cognizable 'scope of employment' to which the questioned conduct could be related." *Id*, at 465.

We believe that *Wrynn* controls our disposition of this case. Here, as in *Wrynn,* Air Force commanding officers authorized the use of Air Force personnel for local civilian law enforcement purposes. The fact that *Wrynn* also involved the use of a helicopter is irrelevant because the Posse Comitatus Act does not forbid the use of military material by civilian police authorities. *United States v Red Feather,* 392 F Supp 916 (SD, 1975). In the instant case, as in *Wrynn,* the Air Force personnel involved received some form of military compensation for their activity. Although the compensation received by Airman Hall in this case was not monetary, it was sufficient to make the Air Force a willing participant in Airman Hall's undercover assistance to the State Police.

Although we recognize that if we were to use

the standard stated in *United States v McArthur*, 419 F Supp 186, 194 (ND, 1976), *aff'd* 541 F2d 1275 (CA 8, 1976), *cert den sub nom Casper v United States*, 430 US 970; 97 S Ct 1654; 52 L Ed 2d 362 (1977), we would not be required to find a violation of the Posse Comitatus Act in this case, we decline to follow that test. The *McArthur* court stated the question before it as whether military personnel were used by civilian law enforcement authorities "in such manner that the military personnel subjected the citizens to the exercise of military power which was regulatory, proscriptive, or compulsory in nature, either presently or prospectively".

There is nothing in the language of the Posse Comitatus Act that authorizes such an interpretation of it or requires that citizens be subjected "to the exercise of military power which was regulatory, proscriptive, or compulsory in nature" in order for it to be violated. The act merely states that military personnel may not be used to enforce local laws. Although it is clear that the subjugation of civilians to military power would violate the act, so does the use of military personnel as undercover agents for civilian authorities. It matters not whether the victim even knows that the undercover agent is in the military. As long as the victim is subjected to *civilian* power or authority by the use of military personnel, the act is violated. *State v Danko*, 219 Kan 490; 548 P2d 819 (1976). To the extent that some cases would require a showing that military personnel assumed a greater authority than that permitted civilians in order for the act to have been violated, those cases were wrongly decided.[1]

_____

[1] *Lee v State*, 513 P2d 125 (Okla Crim, 1973), *cert den* 415 US 932; 94 S Ct 1445; 39 L Ed 2d 490 (1974), *Hildebrandt v State*, 507 P2d 1323 (Okla Crim, 1973), *Hubert v State*, 504 P2d 1245 (Okla Crim, 1972).

Appellant argues that, even if the Posse Comitatus Act were violated, Airman Hall's testimony should not be excluded at trial because the exclusionary rule does not apply to violation of statutes but is limited to violations of the constitution.

Although Michigan courts, cognizant of the policy expressed in Const 1963, art 1, § 11, have declined to adopt suppression of the evidence as a remedy for unlawful police conduct in situations involving violations of Michigan statutes, see, *People v Livingston*, 64 Mich App 247; 236 NW2d 63 (1975), the Posse Comitatus Act is a Federal statute and we are bound by the Federal policy when interpreting it. In *Lee v Florida*, 392 US 378, 385-387; 88 S Ct 2096; 20 L Ed 2d 1166 (1968), the United States Supreme Court held that a violation of the Federal Communications Act required mandatory exclusion of the illegal evidence obtained where this remedy was the only effective way of removing the incentive to disregard the act. Our investigation of the Posse Comitatus Act has failed to uncover any case in which violators of it were prosecuted. Thus, the only real sanction remaining to dissuade persons who would violate its provisions is the sanction of an exclusionary rule. Therefore, we hold that the lower court did not err when it held that Airman Hall could not testify at the defendants' trials.

Affirmed.

BRONSON, J., concurred.

D. F. WALSH, P.J. *(dissenting)*. Defendants were each charged with two counts of delivery of a controlled substance, MCL 335.341(1)(b); MSA 18.1070(41)(1)(b). Prior to trial they moved to exclude the testimony of the prosecution's main

witness, Michael Hall. The trial court granted the motion and plaintiff appeals.

In the summer of 1977, Michael Hall, a member of the United States Air Force stationed at K. I. Sawyer Air Force Base in Marquette County, Michigan, was summoned to the office of a special agent of the Office of Special Investigation (OSI) of the Air Force. There he was confronted by Special Agent Kenneth Parker and two members of the Michigan State Police, Detective Sergeant August Moratti and Trooper David Cope. The state police officers showed Hall a warrant for his arrest, by civilian authorities, on charges of delivery of marijuana. (The record also suggests that Hall was accused by the Air Force of the sale of a controlled substance.) The police officers offered Hall an opportunity to work with them in attempting to find the source of contraband drugs in the Marquette County area. He was also to work with the OSI in this endeavor. Hall was led to believe that, in exchange for his cooperation, he would receive more favorable treatment in connection with the drug charges lodged against him.[1]

On July 26, 1977, Hall reported to the Michigan State Police Post at Negaunee, Michigan. He and his vehicle were searched. He was given three marked $20 bills. Dressed in civilian clothes, he proceeded to an off-base location, the site of a trailer occupied by defendant Patrick C. Burden and Burden's friend, defendant Joyce Jones. He testified at defendants' preliminary examinations that he entered the trailer and purchased various drugs from defendants. According to Hall, he and

---

[1] The record is not entirely clear as to how Hall's cooperation would affect handling by the authorities of the drug charges against him. There is an indication that he was to be given immunity from prosecution by the local authorities and that he would not be considered a "High Risk" at that time for Air Force purposes.

defendant Burden had been partners in a drug sales operation earlier in 1977. Defendant Burden was at the time of the alleged sale of drugs a member of the Air Force stationed at Sawyer Air Force Base. Defendant Jones is a civilian.

Defendants' motions to exclude Hall's testimony were predicated on the alleged violation of the Posse Comitatus Act, 18 USC 1385, which provides:

"Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both."[2]

In a careful and scholarly opinion the trial judge examined the cases which have dealt with the interpretation and application of the Posse Comitatus Act. He concluded that the use of Airman Hall, in investigating and obtaining evidence against defendants, was a direct violation of the act. The court also ruled that violation of the statute necessitated exclusion of Hall's testimony from defendants' trials.

The enactment of the Posse Comitatus Act in 1878 was primarily the result of southern outrage at the use of Federal troops in the South following the civil war. With the end of armed hostility

---

[2] Posse comitatus is defined as follows:

"The power or force of the county. The entire population of a county above the age of fifteen, which a sheriff may summon to his assistance in certain cases; as to aid him in keeping the peace, in pursuing and arresting felons, etc. 1 Bl. Comm. 343; Com. v Martin, 7 Pa. Dist. R. 224." Black's Law Dictionary (4th ed).

Michigan recognizes this common-law power inherent in the office of sheriff and has extended it to deputy sheriffs, coroners and constables. MCL 600.584-600.585; MSA 27A.584-27A.585, MCL 764.16(c); MSA 28.875(c).

between the North and South came a period of
political domination by Northerners of their fellow
citizens in the South. Large numbers of Federal
troops were extensively used in the South to en-
force the law and to support the new carpetbag
governments. The Reconstruction Act of 1867 im-
plemented Congressional belief that military rule
was necessary in the southern states. It was the
"outrageous meddling" of Federal troops in the
1876 presidential elections in the South which
precipitated the proposal and passage of the act.[3]
The following remark made during Senate discus-
sion of the proposed posse comitatus legislation is
illustrative of the concern which underlay its in-
troduction and ultimate passage:

"It would be an entire overthrow, it seems to me, of a
fundamental principle of the laws of this country, of all
our traditions, to say that the Army at the instance of
the law officer, through a marshal or a deputy, special
or general, of election, may call a body of the Army as
a *posse comitatus* and order it about the polls of an
election. We all know that that might be used for an
entire overthrow of the rights of citizens at the polls." 7
Congr Rec 4240 (1878) (remarks of Senator Kernan).

The principle reflected in the Posse Comitatus
Act is one which is firmly and deeply rooted in the
American constitutional system. The seeds of "the
inherited antipathy of the American people to the
use of troops for civil purposes", Sparks, National
Development 1877-1885, p 127, Vol. 23, The Ameri-
can Nation, A History, cited in *Wrynn v United*

---

[3] Furman, *Restrictions Upon Use of the Army Imposed by the Posse
Comitatus Act,* 7 Mil L Rev 85, 94-95 (1960). More detailed discussions
of the events surrounding proposal and passage of the Posse Comita-
tus Act can be found in Meeks, *Illegal Law Enforcement: Aiding Civil
Authorities in Violation of The Posse Comitatus Act,* 70 Mil L Rev 83,
86-92 (1975), and Note, *The Posse Comitatus Act: Reconstruction
Politics Reconsidered,* 13 Amer Crim L Rev 703, 704-707 (1976).

*States,* 200 F Supp 457, 465 (ED NY, 1961), were identified in 1776:

"The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object, the establishment of an absolute tyranny over these states. To prove this, let facts be submitted to a candid world.

\*   \*   \*

"He has kept among us, in times of peace, standing armies without the consent of our legislatures.

"He has affected to render the military independent of, and superior to, the civil power.

"He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his assent to their acts of pretended legislation.

"For quartering large bodies of armed troops among us;

"For protecting them, by a mock trial, from punishment for any murders which they should commit on the inhabitants of these states." Declaration of Independence.

Delegates to the original constitutional convention debated the need for a standing army. Concern was expressed over insuring civilian control over the military. Meeks, *Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Comitatus Act,* 70 Mil LR 83, 86-87 (1975). See US Const, art 1, § 8, clauses 12-14; US Const, Am III; *Laird v Tatum,* 408 US 1, 15-16; 92 S Ct 2318; 33 L Ed 2d 154 (1972).

I share with the trial judge the firm conviction that this fundamental tenet of our system of law—noninterference by the military in civilian affairs—is to be jealously guarded. The Posse Comitatus Act arose in a particular historical and political context but it is "not an anachronistic relic of an

historical period the experience of which is irrelevant to the present". *Wrynn v United States, supra,* at 465. It embodies the very important, pervasive, and continuing American preoccupation with assurance of the separation of civilian and military spheres of authority and the aversion to intrusion of the military into civilian matters.

Nevertheless, although I must commend the trial judge for his thoughtful and comprehensive discussion of the applicability of the Posse Comitatus Act, I find myself in disagreement with his resolution of the issue under the facts in this case.

The act prohibits execution of laws by use of "any part of the Army or the Air Force".[4] The remarks of certain senator who participated in the debate which preceded passage of the act give some indication of the intent of Congress in using this phrase.

"If a soldier sees a man assaulting me with a view to take my life, he is not going to stand by and see him do it, he comes to my relief not as a soldier, but as a human being, a man with a soul in his body, and as a citizen * * *. The soldier standing by would have interposed if he had been a man, but not as a soldier. He could not have gone down in pursuance of the order of his colonel or captain, but he would have done it as a man." 7 Congr Rec 4245 (1878) (remarks of Senator Merrimon).

"Of course there are occasions in all countries where under the laws it is the duty of every man to save life, to save property, to suppress crime. I care not whether he is a soldier or whether he is a citizen, whether a

---

[4] I emphasize that our present discussion of the issue is strictly limited to the facts before me. In addition, I treat only one element of the offense described in the Posse Comitatus Act and express no opinion as to the possibility of defenses based on the remaining elements. Under appropriate circumstances, for example, the "except in cases and under circumstances expressly authorized by the Constitution or Act of Congress" language may be successfully invoked.

man or a woman * * *. But that is not the question involved here. * * * *the point is in their character as an army.*"[5] 7 Congr Rec 4247 (1878). (Remarks of Senator Hill.) (Emphasis added.)

The few commentators who have discussed the Posse Comitatus Act agree that it does not apply to military personnel performing in purely unofficial and individual capacities. Meeks, *supra,* at 126. The act "reaches the single soldier *acting under color of authority"*. Note, *The Posse Comitatus* Act: *Reconstruction Politics Reconsidered,* 13 Amer Crim LR 703, 721, fn 102 (1976). (Emphasis added.) Soldiers, however, do not lose their status as citizens, together with all privileges and duties involved in citizenship, by virtue of assuming military status. *Id.*

In three cases involving the use of soldiers from Fort Sill as undercover agents in the purchase of drugs, the Oklahoma Court of Criminal Appeals found no violation of the act. *Hubert v State,* 504 P2d 1245 (Okla Crim, 1972), *Hildebrandt v State,* 507 P2d 1323 (Okla Crim, 1973), *Lee v State,* 513 P2d 125 (Okla Crim, 1973), *cert den* 415 US 932; 94 S Ct 1445; 39 L Ed 2d 490 (1973). In each case, the court concluded that the undercover agents had assumed no greater authority than that of private citizens in purchasing the drugs. See, for example, *Lee v State, supra,* at 126, where the court observed that the agent had not attempted to assert any military authority over the defendant.

Without expressing an opinion as to the result

---

[5] The original version of the act, which was part of an Army appropriation bill, referred only to the Army. Reference to the Air Force as a separate entity was added in 1956. See *United States v Walden,* 490 F2d 372, 375, fn 5 (CA 4, 1974).

reached in the Oklahoma cases,[6] I nonetheless agree with the underlying premise that, when military personnel involve themselves in an activity which is unconnected to their military status but which involves only their status as private citizens, the Posse Comitatus Act does not apply.

Several cases involving the Posse Comitatus Act arose out of the so-called native American uprising in Wounded Knee, South Dakota, a village on the Pine Ridge Indian Reservation. Among those was *United States v McArthur,* 419 F Supp 186, 194 (ND, 1976), *aff'd* 541 F2d 1275 (CA 8, 1976), *cert den sub nom Casper v United States,* 430 US 970; 97 S Ct 1654; 52 L Ed 2d 362 (1977), where the Federal district court stated the issue to be: Whether "Army or Air Force personnel [were] used by the civilian law enforcement officers at Wounded Knee in such manner that the military personnel *subjected the citizens to the exercise of military power* which was regulatory, proscriptive, or compulsory in nature, either presently or prospectively". (Emphasis added.)

While *McArthur* and the other Wounded Knee cases[7] are distinguishable from the case at bar on their facts it is significant to note here the emphasis which the South Dakota Federal District Court placed on the necessity of demonstrating an *exercise of military* authority by those members of the military used to execute civilian laws if a violation of the Posse Comitatus Act was to be proven.

---

[6] These three Oklahoma cases have been criticized, one commentator noting that the undercover agents were Criminal Investigation Division agents who were merely engaging in their primary military occupation as criminal investigators and routinely and systematically aiding civilian law enforcement officials. Meeks, *supra,* at 112-113. For futher criticism, see 13 Amer Crim L R, *supra,* at 720-723.

[7] The other Wounded Knee cases are *United States v Jaramillo,* 380 F Supp 1375 Neb, 1974), *app dis'd* 510 F2d 808 (CA 8, 1975), *United States v Banks,* 383 F Supp 368 (SD, 1974) *app dis'd* 513 F2d 1329 (CA 8, 1975), *United States v Red Feather,* 392 F Supp 916 (SD, 1975).

I find no violation of the act in this case. In cooperating with and assisting the civilian police agency, Hall was not acting as a member of the military. He was acting only as a civilian. His military status was merely incidental to and not essential to his involvement with the civilian authorities. He was not in military uniform. He was not acting under military orders. He did not exercise either explicitly or implicitly any military authority. Moreover, Hall was not a regular law enforcement agent of the military (see footnote 6, *supra)*, nor does the record suggest that Hall's usefulness to civilian authorities was in any way enhanced by virtue of his being a military man. As we read the record, the assistance rendered by Hall was in no way different from the cooperation which would have been given by a private citizen offered the same opportunity to avoid criminal prosecution. To paraphrase Senator Hill, Hall's character as "part of the Army or the Air Force" was irrelevant to the assistance he rendered to the civilian authorities.

I would reverse the order excluding Hall's testimony from defendants' trials.