# Military Use of Infrared Radars Technology to Assist Civilian Law Enforcement Agencies

The Department of Defense has statutory authority to assist civilian law enforcement agencies to identify or confirm suspected illegal drug production within structures located on private property by providing them with aerial reconnaissance that uses Forward Looking Infrared Radars technology.

February 19, 1991

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE

This memorandum is in response to your request for our opinion whether, under existing statutory authority, the Department of Defense may assist civilian law enforcement agencies to identify or confirm suspected illegal drug production within structures located on private property by providing them with aerial reconnaissance that uses Forward Looking Infrared Radars technology. We conclude that such assistance is authorized by 10 U.S.C. § 374(b)(2)(B), and not prohibited by 10 U.S.C. § 375.

## I.

Forward Looking Infrared Radars ("FLIR") is a passive technology that detects infrared radiation generated by heat-emitting objects. Infrared rays are received by the FLIR system, electronically processed, and projected on a screen as a visual image in the shape of the object that is emitting the heat. The warmer the object, the brighter the image of the object appears. *See United States v. Sanchez*, 829 F.2d 757, 759 (9th Cir. 1987); *United States v. Kilgus*, 571 F.2d 508, 509 (9th Cir. 1978). FLIR is not an x-ray technology. We have been informed that it cannot provide information concerning the interior of an object or structure. It detects only heat emanating from surfaces that are directly exposed to the FLIR system. Thus, for example, if there were heat-producing objects within a building, FLIR could detect that more infrared radiation was being emitted from the building's roof than if the building were empty, but the system could not identify the shapes of

36

heat-emitting objects located within the structure. Nor could the system identify the source of the heat or the precise location of the heat source within the structure.

Law enforcement agencies believe that FLIR technology can be useful in identifying buildings that house marijuana crops, or methamphetamine or other drug processing laboratories. In particular, FLIR can aid law enforcement officials in establishing probable cause that criminal activity is ongoing within a particular building by determining whether the building is radiating unusually large amounts of heat (due to the use of high intensity lighting or combustion generators) or unusually small amounts of heat (due to heavy insulation). Recently, therefore, federal and state law enforcement agencies have requested that military aircraft equipped with FLIR fly over suspect buildings on private lands and produce infrared images of those structures.

The Department of Defense ("DoD") has informed us of three requests for assistance that present the question whether such military assistance is authorized. The Drug Enforcement Administration ("DEA") has asked the Army to conduct infrared imaging of a barn on private land in which the DEA suspects that marijuana is being cultivated. Second, a law enforcement agency has requested that an Army flight crew conduct a training mission over certain private lands and buildings in the vicinity of Wichita, Kansas, using an Army helicopter equipped with FLIR, to identity suspected illegal marijuana cultivation. And third, the DEA has asked that the Army undertake flights in OH-58D helicopters equipped with FLIR, at a height of at least 500 feet above ground, to identify dwellings and other structures on private land in Arizona that the DEA suspects contain methamphetamine laboratories. The requesting agencies maintain that the Defense Department has the authority to provide the requested assistance under the provisions of 10 U.S.C. §§ 371-378, which are designed to promote cooperation between military personnel and civilian law enforcement officials.

## II.

Chapter 18 of title 10, which was enacted by Congress in 1981 and subsequently amended in 1988 and 1989, authorizes DoD to provide several forms of assistance to civilian law enforcement officials. Sections 371 through 373 permit the Secretary of Defense to provide these officials with information collected during training missions; equipment or facilities needed for law enforcement purposes; and training or advice relevant to equipment that is provided. Section 374 authorizes the Secretary to make DoD personnel available for the operation and maintenance of equipment in connection with a limited number of law enforcement purposes. Each of these authorizations is subject to the limitations in section 375 that the Secretary of Defense prevent "direct participation by a member of the Army, Navy, Air Force, or

37

Marine Corps in a search, seizure, arrest, or other similar activity." *Id.* § 375.[1]

We believe it is clear from the language and legislative history of sections 371 through 374 that FLIR surveillance is authorized by those sections, subject to the restrictions of section 375.[2] Section 372 permits the Secretary of Defense to make available to any federal, state or local law enforcement official "any equipment" for law enforcement purposes, and obviously FLIR constitutes "equipment." Section 374, as amended, allows DoD personnel to operate such equipment for the purpose of "aerial reconnaissance," which is precisely what is contemplated in the requests that have been made. 10 U.S.C. § 374(b)(2)(B).[3] The normal meaning of the term "reconnaissance" is "an exploratory or preliminary survey, inspection, or examination made to gain information." *Webster's Third New International Dictionary* 1897 (1986). FLIR surveillance from aircraft is clearly "aerial reconnaissance," so defined. The only limitation on aerial reconnaissance even suggested by the legislative history is that it should "be used for reconnaissance of property and not for surveillance of persons." H.R. Conf. Rep. No. 989, 100th Cong., 2d Sess. 451 (1988) ("1988 Conference Report"). Here, of course, the proposed reconnaissance is of property, not persons. We conclude, therefore,

---

[1] The scope of section 375 is itself restricted by 10 U.S.C. § 378, which states that "[n]othing in this chapter shall be construed to limit the authority of the executive branch in the use of military personnel or equipment for civilian law enforcement purposes beyond that provided by law before December 1, 1981." Thus, if FLIR surveillance of private buildings would not have been prohibited by the Posse Comitatus Act, 18 U.S.C. § 1385, before 1981, section 375 does not proscribe such surveillance. *See infra* note 16.

[2] All parties who have reviewed the requests for DoD assistance that are at issue here appear to agree with this conclusion. Memorandum for Terrence O'Donnell, General Counsel, Department of Defense, from Robert M. Smith, Jr., at 32-33 (Sept. 19, 1980) ("Smith Memorandum"); Memorandum for Office of the Deputy Chief of Staff for Operations and Plans, from Patrick J. Parrish, Assistant to the General Counsel, Department of the Army at 1 (Sept. 17, 1990) ("Parrish Memorandum"); Memorandum for Joint Chiefs of Staff, from Lt. Col. C.W. Hoffman, Jr., Deputy LLC at 1 (Aug. 14, 1990) ("Hoffman Memorandum").

[3] Originally, section 374 authorized DoD personnel to operate equipment "only to the extent the equipment is used for monitoring and communicating the movement of air and sea traffic," and in certain emergency circumstances. Department of Defense Authorization Act, 1982, Pub. L. No. 97-86, tit. IX, § 905(a)(1), 95 Stat. 1099, 1115 (1981). At the time, Congress believed these were the "primary type[s] of assistance sought and needed by Federal drug enforcement agencies." H.R. Conf. Rep. No. 311, 97th Cong., 1st Sess. 120 (1981) ("1981 Conference Report").

When it added the authority for military aerial reconnaissance assistance in 1988, Congress intended to permit military assistance not only in connection with the interdiction of drugs bound for the United States from foreign countries, but also in connection with the eradication of domestically produced narcotics. Several witnesses before the House and Senate Armed Services Committees testified that DoD assistance in the domestic "drug war" was in high priority. *See The Role of the Military in Drug Interdiction: Joint Hearings Before the House and Senate Armed Services Committees*, 100th Cong., 2d Sess. 187 (1988) (statement of Larry L. Orton, Special Agent in Charge, El Paso Intelligence Center, Drug Enforcement Agency) ("We further believe that the National Guard [should] help us in the role that we have here domestically in the United States, and that is the eradication of domestically grown marijuana in the national force. . . . We actually need people to go in, fly over them and locate them, and then go into the patches to eradicate."); *id.* at 242 (statement of Don Siegelman, Attorney General of Alabama) ("Military equipment and certain personnel should be made available, under specified conditions, to assist civilian authorities conduct air and land marijuana spotting and eradication. Military helicopters and pilots could make a significant contribution to the systematic aerial surveying of suspected marijuana growing areas."); *id.* at 257 (statement of Edward Koch, Mayor of New York, New York) ("I believe that those helicopters should be flying over identifying the marijuana fields. . . . Then you notify the local cops, and the cops go in and make the arrest.").

38

that FLIR surveillance of buildings on private property is authorized aerial reconnaissance under sections 371-374, subject only to the restrictions set forth in section 375.[4]

## III.

Section 375 requires the Secretary of Defense to prescribe regulations ensuring that activity undertaken pursuant to sections 371 to 374 does not result in "direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity." 10 U.S.C. § 375. The Secretary has promulgated regulations, based upon an earlier version of the statute, that prohibit military personnel from conducting "[a] search or seizure." 32 C.F.R. § 213.10(a)(3).[5] We understand DoD to take the position that the term "search" in the regulations is intended to have the same meaning as does the statutory term "search," and we assume for purposes of this opinion that this is correct.

DoD has assumed that the statutory term "search" was intended to be coextensive with the same term in the Fourth Amendment and thus that the applicability of the section 375 prohibition to the assistance requested here turns on whether the FLIR surveillance constitutes a "search" within the meaning of the Fourth Amendment.[6] Proceeding on this assumption, DoD has concluded that FLIR surveillance is a "search," and therefore that section 375 prohibits the military from providing the FLIR surveillance assistance to civilian law enforcement agencies. We conclude from the language, structure, and legislative history of section 375 that, contrary to DoD's assumption, the meaning of the term "search" was not intended to be coextensive with the meaning of the same term in the Fourth Amendment. Instead, when Congress used the term "search" in section 375, it intended that the term encompass at most only searches involving physical contact with civilians or their

---

[4] Section 371 authorizes the Secretary of Defense to provide to civilian law enforcement officials "any information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law." DoD's provision of FLIR surveillance information obtained during training missions in the vicinity of Wichita, Kansas, would thus appear to be separately authorized by section 371 if the requested FLIR surveillance were conducted in the "normal course of military training."

[5] The regulations promulgated by the Department of Defense state:

Except as otherwise provided in this enclosure, the prohibition on use of military personnel "as a posse comitatus or otherwise to execute the laws" prohibits the following forms of direct assistance:

(i) Interdiction of a vehicle, vessel, aircraft or other similar activity.

(ii) A search or seizure.

(iii)An arrest, stop and frisk, or similar activity.

(iv) Use of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators.

32 C.F.R. § 213.10(a)(3) (1991). These regulations were promulgated after chapter 18 was enacted in 1981, but they have not been amended to achieve consistency with the statutory changes enacted in 1988 and 1989. For example, subsection (i) of the regulations includes language that no longer appears in 10 U.S.C. § 375.

[6] Smith Memorandum at 3, 32-38; accord Parrish Memorandum at 1; contra Hoffman Memorandum at 2, supra.

39

property, and perhaps only searches involving physical contact that are likely to result in a direct confrontation between military personnel and civilians.

## A.

There is no reason to assume, as a threshold matter, that the meaning of the term "search" in section 375 is coextensive with that of the same word in the Fourth Amendment. "[O]f course words may be used in a statute in a different sense from that in which they are used in the Constitution." *Lamar v. United States*, 240 U.S. 60, 65 (1916); *see also Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 494-95 (1983) (meaning of "arising under" in Article III, Section 2 differs from that of the same phrase in 28 U.S.C. § 1331); *Towne v. Eisner*, 245 U.S. 418, 425 (1918) ("[I]t is not necessarily true that income means the same thing in the Constitution and the [Income Tax] Act."). The term "search" has acquired a specialized meaning in Fourth Amendment jurisprudence, in light of the Amendment's expansive purpose to protect all reasonable expectations of privacy. That specialized definition clearly encompasses activity in which there is no physical contact with or intrusion into private property, such as electronic wiretapping. *Katz v. United States*, 389 U.S. 347 (1967).

In common parlance, however, the term usually connotes at least some amount of physical contact or interference. Indeed, Justice Brandeis conceded in his dissenting opinion in *Olmstead v. United States*, 277 U.S. 438 (1928), which foreshadowed the Court's decision in *Katz* overruling *Olmstead*, that the "ordinary meaning" of "search" would encompass only activity involving a physical trespass. *Id.* at 476-78 (Brandeis, J., dissenting). Although Justice Brandeis was ultimately unsuccessful in persuading his colleagues of his substantive position, the most that he could say about their construction of the term "search" was that it was "unduly literal."[7] The "ordinary meaning" of "search" relied upon by the Court and recited by Justice Brandeis in *Olmstead* is frequently that intended by Congress. A number of statutes concerning searches by law enforcement officials, for example, seem to assume that a "search" involves some physical contact between law enforcement personnel and civilians.[8] It should not be presumed, therefore, that the term "search" in section 375 is coextensive with the same term in the Fourth Amendment.

---

[7] It is evident from his opinion that Justice Brandeis did not use the phrase "unduly literal" to suggest that the majority was mistaken as to the ordinary meaning of the term "search." His only point was that adoption of the "ordinary meaning" of the term was inappropriate given the broad privacy protection purpose of the Fourth Amendment.

[8] *See, e.g.*, 7 U.S.C. § 164a (authorizing Department of Agriculture employees "to stop and, without warrant, to inspect, search, and examine such person, vehicle, receptacle, boat, ship, or vessel"); 18 U.S.C. § 913 (subjecting to prosecution "[w]hoever falsely represents himself to be an officer, agent, or employee of the United States, and in such assumed character arrests or detains any person or in any manner searches the person, buildings, or other property of any person"); *id.* § 2231 (subjecting to prosecution "[w]hoever forcibly assaults, resists, opposes, prevents, impedes, intimidates, or interferes with any person authorized to serve or execute search warrants or to make searches and seizures"); *id.*

Continued

The context in which the word "search" appears in section 375 suggests that Congress indeed may have intended the term to refer only to searches involving physical contact. Section 375 employs the term "search" in association with "seizure" and "arrest," terms which contemplate some physical contact with persons or property.[9] If one invokes the common sense maxim noscitur a sociis, "[w]here any particular word is obscure or of doubtful meaning, taken by itself its obscurity or doubt may be removed by reference to associate words," *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893), it would appear that Congress intended for the term "search" in title 10 to have the narrow, "ordinary meaning," rather than the meaning ascribed to the term in the Fourth Amendment. This suggestion is reinforced by the fact that Congress extended the prohibition in section 375 also to "other similar activit[ies]," that is, to other activities similar to searches, seizures, and arrests. It is apparent from this phrase that Congress regarded searches, seizures, and arrests as similar activities.[10] Apart from the obvious fact that these are all law enforcement activities, one of the fundamental similarities of these activities is that each entails some amount of physical contact.

The intent of Congress in section 375 to prohibit only searches involving physical contact is particularly evident in the original version of section 375. As enacted in 1981, section 375 forbade direct participation by DoD personnel "in an interdiction of a vessel or aircraft, *a search and seizure*, arrest, or other similar activity." Pub. L. No. 97-86, tit. IX, § 905(a)(1), 95 Stat. 1099 1116 (1981) (emphasis added). The coupling of "search" and "seizure" through use of the conjunctive "and," and the reference to the two as a single event (*i.e.*, "*a* search and seizure"), strongly suggests that Congress was referring to searches of persons or objects that had been seized and thus were in the custody of law enforcement officers. Searches of seized persons or objects almost always involve physical contact.[11]

---

[8] (....continued)
§ 2232 (distinguishing between "searches" and "electronic surveillance" and prohibiting "Physical Interference With Search"); 33 U.S.C § 383 ("The commander and crew of any merchant vessel of the United States . . . may oppose and defend against any aggression, search, restraint, depredation, or seizure, which shall be attempted upon such vessel       .").

[9] To "seize" is to "take hold of suddenly or forcibly" or "to take possession of by force or at will." *Random House Dictionary of the English Language* 1734 (1987). In the law, a "seizure" generally requires "an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U S 593, 596 (1989). "Arrest" is most commonly defined as "the act of stopping or restraining (as from further motion)." *Webster's Third New International Dictionary* 121 (1986) The traditional meaning of "arrest" in the legal context is the seizure of a person which "eventuate[s] in a trip to the station house and prosecution for crime." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). *See also Douglas v. Buder*, 412 U S. 430, 431-32 (1973); *Cupp v. Murphy*, 412 U S 291, 294 n 1 (1973). Both arrests and seizures thus virtually always entail physical contact.

[10] It is possible to read the catch-all phrase "other similar activit[ies]" to include any activity similar to searches, similar to seizures, or similar to arrests, in which event no inference need be drawn as to whether Congress regarded searches, seizures, and arrests as themselves similar to each other. This would be a natural reading of the phrase, however, only if the enumerated activities had nothing in common.

[11] The inference that Congress was concerned only with searches that entail some physical contact is strengthened by the inclusion of "search and seizure" in a series of terms with "interdiction" and "arrest," both of which also generally entail physical contact. *See supra* p. 41

41

Although Congress amended section 375 in 1989, so that it now prohibits participation in a "search, seizure, arrest, or similar activity," there is no indication that by deleting the word "and," Congress intended to signal a departure from the statute's original purpose. *See* H.R. Conf. Rep. No. 331, 101st Cong., 1st Sess. 654 (1989). The 1989 amendment merely clarifies the section so as to prohibit military personnel from participating in searches entailing physical contact, even if they will not involve or lead ultimately to seizures.

**B.**

**1.**

The legislative history of chapter 18 confirms that Congress intended in section 375 to prohibit at most searches by the military that entail physical contact with civilians or their property, and perhaps only such searches that are likely to result in direct confrontation between military personnel and civilians. The history of section 375 actually begins with the Posse Comitatus Act, 18 U.S.C. § 1385, which governed military involvement in law enforcement activity prior to enactment of chapter 18 in 1981.[12] The Posse Comitatus Act was adopted in 1878 in response to objections from southern States to United States Army participation in civilian law enforcement during Reconstruction. In the one hundred years immediately following its enactment, the Posse Comitatus Act was rarely the subject of litigation. To date, few courts have attempted to define the contours of the Act, and there apparently has never been a prosecution under the Act. *See Posse Comitatus Act, Hearings on H.R. 3519 Before the Subcomm. on Crime of the House Comm. on the Judiciary*, 97th Cong., 1st Sess. 21 (1981) (statement of Edward S.G. Dennis, Jr., Department of Justice) (*"Posse Comitatus Hearings"*). By 1948, the Posse Comitatus Act was characterized by one court as an "obscure and all-but-forgotten statute." *Chandler v. United States*, 171 F.2d 921, 936 (1st Cir. 1948), *cert. denied*, 336 U.S. 918 (1949).

The courts that confronted issues under the Posse Comitatus Act before 1981 did not interpret the Act uniformly. Some understood the Act as a broad and absolute prohibition against virtually any military participation in civilian law enforcement activity. In two cases arising from the 1973 federal occupation of Wounded Knee, South Dakota, for example, the courts concluded that the mere provision of tactical advice by a military officer, if it were subsequently acted upon by civilians, would be unlawful. *United States v. Jaramillo*, 380 F. Supp. 1375, 1381 (D.S.D. 1974), *appeal dismissed*,

---

[12] The Posse Comitatus Act states:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

510 F.2d 808 (8th Cir. 1975); *United States v. Banks*, 383 F. Supp. 368, 375 (D.S.D. 1974). Another court held under the Federal Tort Claims Act that the use of an Air Force helicopter and its personnel to aid in a search for a nonmilitary prison escapee was forbidden by the Posse Comitatus Act. The court emphasized that "[t]he innocence and harmlessness of the particular use of the Air Force in the present case [and] the dissimilarity of that use to the uses that occasioned the enactment . . . are irrelevant to the operation of a statute that is absolute in its command and explicit in its exceptions." *Wrynn v. United State*, 200 F. Supp. 457, 465 (E.D.N.Y. 1961).

Other courts, however, concluded that the Posse Comitatus Act permitted military personnel to offer certain forms of "passive" or "nonauthoritarian" assistance to civilians. In another Wounded Knee case, the court interpreted the Act to prohibit the military from "*actively* performing *direct* law enforcement duties," but to allow a "*passive* role which might *indirectly* aid [law enforcement]." *United States v. Red Feather*, 392 F. Supp. 916, 924-25 (D.S.D. 1975). This court concluded that military involvement in the arrest of a person, seizure of evidence, search of a person, or search of a building constituted impermissible "direct" aid, but that tactical advice, training, and aerial photographic reconnaissance flights were "indirect" assistance permitted by the Act. *Id.*

A second court concluded after transfer of the *Red Feather* case that the Posse Comitatus Act prohibited only military activity "which is regulatory, prescriptive or compulsory in nature, and causes the citizens to be presently or prospectively subject to regulations, proscriptions, or compulsions imposed by military authority." *United States v. McArthur*, 419 F. Supp. 186, 194 (D.N.D. 1975), *aff'd sub nom.*, *United States v. Casper*, 541 F.2d 1275 (8th Cir. 1976), *cert. denied*, 430 U.S. 970 (1977). The court believed that the Act did not outlaw "the borrowing of highly skilled personnel, like pilots and highly technical equipment like aircraft and cameras, for a specific, limited, temporary purpose." *Id.* This Office, in 1978, endorsed the common points of the analyses in *Red Feather* and *McArthur*, concluding that military assistance in civilian law enforcement does not violate the Posse Comitatus Act where "there is no contact with civilian targets of law enforcement, no actual or potential use of military force, and no military control over the actions of civilian officials." Letter for Deanne Siemer, General Counsel, Department of Defense, from Mary Lawton, Deputy Assistant Attorney General, Office of Legal Counsel at 13 (Mar. 24, 1978) ("Lawton Letter").

In the wake of this series of decisions, there understandably was substantial confusion over the kinds of assistance that the military could provide to civilian law enforcement officials.

## 2.

Congress addressed the confusion that had arisen and clarified the boundaries of permissible DoD law enforcement activity in 1981 through

amendments to chapter 18. H.R. Rep. No. 71, 97th Cong., 1st Sess., pt. 2, at 3 (1981) ("1981 House Report"); S. Rep. No. 58, 97th Cong., 1st Sess. 148 (1981). It is evident from the legislative history of these amendments that Congress intended to codify the distinction — articulated by the district court in *United States v. Red Feather* — between "indirect passive" assistance and "direct active" involvement in law enforcement activity. Edward Dennis, testifying on behalf of the Department of Justice, stated the Department's view that "the principle which is put forth in the statutes is that the armed services would be called upon to lend indirect and passive forms of assistance to civilian law enforcement." *Posse Comitatus Hearings*, at 21. An expert on military-civilian relations, Professor Christopher Pyle, objected strenuously to the *Red Feather* analysis, but acknowledged that "[i]t is not difficult to see how the proposals currently before the Subcommittee build upon this opinion." *Id.* at 42. And Rear Admiral Donald Thompson of the Coast Guard reported that the Navy relied on the Wounded Knee cases to "permit[] aerial surveillance or photo-reconnaissance missions in support of law enforcement activities on a not-to-interfere basis." *Id.* at 49.

The committee reports from the House Judiciary Committee and the Conference Committee are relatively clear that Congress intended to adopt the *Red Feather* passive-active distinction. The committee report on the House bill, from which the authority granted in section 374 derives, rejected the absolutist view of the Posse Comitatus Act taken by the courts in *United States v. Jaramillo* and *United States v. Banks*, stating that those decisions "serve to illustrate the confusion regarding the Act and the problems that result when it is too mechanically applied." 1981 House Report, at 6. The House committee referred more favorably to the conclusion of the *Red Feather* court that only "the direct active use of Army or Air Force personnel" was prohibited, *id.*, and the Conference Committee eventually provided in section 375 for restrictions only "on the direct participation of military personnel in law enforcement activities." 1981 Conference Report at 121.

Significantly, Congress understood *Red Feather* to prohibit only activity that entailed direct, physical confrontation between military personnel and civilians. During the hearings, Representative Hughes, Chairman of the Subcommittee on Crime, observed to William H. Taft IV, General Counsel of the Department of Defense:

> I can understand where you might have to have military personnel, actually operate [in a law enforcement capacity] under given circumstances. I understand that. But that is a long way from giving them the authority to make an arrest or to make a seizure.
>
> An assist, as opposed to a military person making an arrest or participating in a seizure is an important distinction.

44

*Posse Comitatus Hearings,* at 28. During the same exchange, Mr. Taft endorsed that prohibition on direct participation by military personnel in arrests or seizures, and presented his view of the passive-active principle: "[I]t is the arrests and the seizures, and active — *putting, really, into a confrontation, an immediate confrontation, the military and a violator of a civilian statute,* that causes us the greatest concern." *Id.* at 30 (emphasis added).[13]

Congress' concern with confrontation between military personnel and civilians is also apparent from the discussions over the provisions of the original section 374(c). That section authorized the use of military personnel to operate equipment outside the land area of the United States only in certain emergencies where the Attorney General and the Secretary of Defense jointly determine that an emergency exists. These procedural safeguards were incorporated because "[t]he conferees were concerned that [the] use of military personnel in such operations *had the potential for placing such personnel in confrontational situations."* 1981 Conference Report at 120 (emphasis added).

In sum, in codifying the *Red Feather* passive-active participation distinction, Congress "maximize[d] the degree of cooperation between the military and civilian law enforcement," 1981 House Report at 3, while carefully preventing the direct, physical confrontation between military personnel and civilians which it believed would "fundamentally alter the nature of the relationship between the military and civilian society." *Id.* at 11.[14]

## 3.

In 1988, Congress enacted amendments to chapter 18 which further underscore that the purpose of section 375 was to codify the *Red Feather* distinction between "passive" and "active" assistance and thus to prohibit direct interface between military forces and civilians. National Defense Authorization Act, Fiscal Year 1989, Pub. L. No. 100-456, § 1104, 102 Stat. 1918, 2045 (1988). Specifically, Congress deleted the ban in section 375 on participation in "an interdiction of a vessel or aircraft," because that phrase had been understood to prohibit activities which did *not* involve physical confrontation between the military and civilians. The Conference Report explains:

> The conferees deleted the term "interdiction of a vessel or aircraft," which is set forth in current law, *because the term "interdiction" has acquired a meaning that includes detection and monitoring as well as a physical interference with the*

---

[13] This colloquy caused Representative Hughes to propose language, which was eventually incorporated into section 374(b), that allows DoD personnel to operate or assist in operating equipment for law enforcement purposes. *Id.* at 29.

[14] Some activities prohibited under the *Red Feather* analysis, such as searches of buildings and seizures of evidence, do not *necessarily* entail confrontations with civilians. To the extent that such searches are prohibited under section 375, this reflects Congress' concern that in carrying out such activities, military personnel likely would be placed in a confrontational posture with civilians.

45

*movement of a vessel or aircraft.* The conferees emphasize, however, that they do not intend by this action to authorize military personnel to interrupt the passage of a vessel or aircraft except as otherwise authorized by law.

1988 Conference Report at 452 (1988) (emphasis added).

As part of the 1988 revision, Congress also amended section 374 to authorize DoD personnel to operate equipment outside the United States for the purpose of transporting civilian law enforcement officials. 10 U.S.C. § 372(b). This authority, however, was expressly made subject to joint approval by the Secretary of Defense, the Attorney General, and the Secretary of State "because of *the potential for involving DOD personnel in a direct law enforcement confrontation,* even though their role is designed for logistical support." 1988 Conference Report at 452 (emphasis added). Finally, a new subsection (c) of section 374 was added to permit the Secretary of Defense to make DoD personnel available to civilian law enforcement officials for other purposes, but "only to the extent that such support does not involve direct participation by such personnel in a civilian law enforcement operation." *Id.* § 374(c). In a telling explanation of how Congress understood the prohibition in subsection 374(c) on "direct participation . . . in a civilian law enforcement operation," the Conference Report stated that "[t]o the extent that transportation of law enforcement officials or use of military officials *does not reasonably raise the possibility of a law enforcement confrontation,* such assistance may be provided in the United States under subsection (c)." 1988 Conference Report at 452 (emphasis added).[15]

Accordingly, we conclude that Congress intended section 375 to prohibit at most military participation in searches involving physical contact with civilians or their property, and perhaps only such searches that are likely to result in direct, physical confrontation between military personnel and civilians.[16]

---

[15] Two recent opinions of this Office have concluded, based largely on this legislative history, that Congress intended in section 375 to bar only the exercise of military authority in contexts where there are likely to be direct confrontations with civilians. *Use of Navy Drug-Detecting Dogs by Civilian Postal Inspectors,* 13 Op. O.L.C. 312 (1989); *Use of Department of Defense Drug-Detecting Dogs to Aid in Civilian Law Enforcement,* 13 Op. O.L.C. 185 (1989).

[16] Because FLIR aerial reconnaissance is authorized by section 374 and not prohibited by section 375, it cannot be prohibited by the Posse Comitatus Act. That Act, by terms, does not apply to activities "expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. For the same reason, we need not consider whether FLIR surveillance would otherwise be permitted by the Posse Comitatus Act, and thus excepted from the prohibitions of section 375 by 10 U.S.C. § 378. As noted, however, this Office concluded in 1978 that the Posse Comitatus Act does not bar the use of military personnel in situations where "[t]here is no contact with civilian targets of law enforcement, no actual or potential use of military force, and no military control over actions of civilian officials." Lawton Letter at 13. Thus, there is a substantial argument that FLIR surveillance to assist civilian law enforcement officials would be permitted by the Posse Comitatus Act even in the absence of section 374, and therefore could not be prohibited by section 375.

# IV.

DoD's principal argument that section 375 prohibits FLIR surveillance is that the term "search" in section 375 is coextensive with the term "search" in the Fourth Amendment. This argument rests on the unsupported assertion that the "usual" meaning of "search" is that ascribed to the term in the Fourth Amendment, *see* Smith Memorandum at 34, an assertion that we reject for the reasons set forth above. DoD also supports its argument with the general statements from the legislative history that Congress sought to "'reaffirm the traditionally strong American antipathy towards the use of the military in the execution of civil law'" and to avoid "'modification in this country's long tradition of separating the military from day to day involvement in the execution and operation of the civilian laws.'" Smith Memorandum at 34 (quoting 1981 House Report at 10-11). Reliance upon Congress' reaffirmation of these traditions, however, begs the only relevant question, which is precisely what historical paradigm Congress sought to reaffirm. As we have shown, the text and history of the legislation amply demonstrate that tradition was essentially that military personnel should be excluded from participation in activities that are likely to result in direct confrontation with civilians.[17]

DoD also argues that because Congress in recent years has declined to authorize active military personnel to conduct searches of cargo, vehicles, vessels, and aircraft at points of entry into the United States, section 375 cannot be interpreted to prohibit only activity that would result in confrontation between military personnel and civilians. Smith Memorandum at 34. We would not draw any inference about the meaning of the statute from Congress' inaction on these proposals. *See Pension Benefit Guaranty Corp. v. The LTV Corp.*, 496 U.S. 633, 650 (1990); *United States v. Wise*, 370 U.S. 405, 411 (1962). In any event, an interpretation of section 375 that precluded border searches could well be consistent with our analysis, because such searches generally would require use of the military in circumstances likely to result in physical contact or in confrontations with civilians.

Finally, if DoD's interpretation of section 375 were correct, then section 375 would prohibit much of the assistance to civilian law enforcement that is authorized under section 374. Section 375 forbids direct participation not only in searches, seizures, and arrests, but also in "other similar activity." If aerial reconnaissance flights over private lands using FLIR technology constitute

---

[17] DoD acknowledges in a footnote that "[t]he *Red Feather* test was adopted . . . by the Congress in 10 U S C § 375," but contends that FLIR surveillance by military personnel nonetheless would violate section 375 because military personnel would be "actively performing direct law enforcement duties." Smith Memorandum at 35 n.106 (quoting *United States v Red Feather*, 392 F. Supp. 916, 925 (D S.D. 1975)). Once one concedes that Congress intended to codify in section 375 the *Red Feather* analysis, it is virtually impossible to conclude that FLIR surveillance is prohibited under the section  Congress clearly understood *Red Feather* to prohibit at most only searches that involved physical contact with civilians or their property  And the *Red Feather* court even stated that aerial photographic reconnaissance was not "direct" assistance of the kind prohibited by the Posse Comitatus Act. 392 F  Supp. at 925.

"searches," then analogous activities, such as aerial reconnaissance of open marijuana fields using binoculars or night-vision equipment, naked eye observations of smoke emissions from building rooftops, and other non-trespassory means of detecting and monitoring drug smuggling or production would constitute "other similar activit[ies]," and thus be prohibited. *See supra* at p. 41 & n.11.[18] Indeed, much of the law enforcement assistance authorized by section 374 would be prohibited if FLIR surveillance constitutes a "search" for purposes of the statute. DoD personnel would be forbidden, for example, from operating equipment for detection, monitoring, and communication of the movement of air and sea traffic and from conducting aerial reconnaissance. 10 U.S.C. § 374(b)(2). Congress obviously did not intend to forbid in section 375 the activity that it authorized in section 374. It is evident therefore that the term "search" in section 375 cannot include FLIR surveillance.

## CONCLUSION

We believe that the language, structure, and history of section 375 together convincingly demonstrate that Congress intended to prohibit at most searches by the military that entail physical contact with civilians or their property, and perhaps only searches entailing physical contact that are likely to result in a direct confrontation between military personnel and civilians. Because FLIR surveillance does not constitute even a search involving physical contact with civilians or their property, we conclude that DoD personnel are authorized by section 374(b)(2)(B) to conduct FLIR surveillance of buildings on private property, even assuming that the surveillance constitutes a search for purposes of the Fourth Amendment.[19]

J. MICHAEL LUTTIG
*Assistant Attorney General*
*Office of Legal Counsel*

---

[18] DoD apparently would confine the prohibition on "other similar activity" to Fourth Amendment searches, and it would not construe section 375 to ban other activities permitted by section 374. Even accepting DoD's assumption that FLIR surveillance constitutes a Fourth Amendment search, however, this simply is not a permissible construction of the text, because it would render the general words "other similar activity" meaningless

[19] DoD has not asked us to address, and we do not address, whether FLIR surveillance constitutes a Fourth Amendment search. *See* Smith Memorandum at 3.